Scott ARMSTRONG, et al., Plaintiffs,

v.

**EXECUTIVE OFFICE OF THE PRESIDENT, et al., Defendants.**

Civ. A. No. 89–142 (CRR).

United States District Court, District of Columbia.

Feb. 14, 1995.

Michael E. Tankersley, attorney for Public Citizen Litigation Group, Washington, DC, argued the case, for plaintiffs. With him on the briefs was Alan B. Morrison, attorney for Public Citizen Litigation Group.

Anthony J. Coppolino and Jason R. Baron, attorneys, U.S. Dept. of Justice, Civ. Div., Washington, DC, argued, for defendants. With them on the briefs were Frank W. Hunger, Asst. U.S. Atty. Gen., U.S. Dept. of Justice, Washington, DC, Eric H. Holder, U.S. Atty. for District of Columbia, David J. Ánderson, Elizabeth A. Pugh, Peter D. Coffman, and Carol Federighi, attorneys, U.S. Dept. of Justice, Civ. Div., Washington, DC.

## *MEMORANDUM OPINION*

CHARLES R. RICHEY, District Judge.

TABLE OF CONTENTS

INTRODUCTION......................................................... 694
PROCEDURAL HISTORY ................................................ 695
STATEMENT OF QUESTION PRESENTED ............................. 696

FACTS ......................................................... 697
 A. THE RECORDKEEPING STATUTES ........................... 698
 B. THE STRUCTURE OF THE NATIONAL SECURITY COUNCIL 699
DISCUSSION ..................................................... 699
 I. THE "LAW OF THE CASE" DOCTRINE DOES NOT BAR THE COURT FROM DECIDING THE STATUS OF THE NSC BECAUSE THE ISSUE HAS NOT BEEN PREVIOUSLY DECIDED ......................... 699
 II. THE COURT FINDS THAT THE NSC IS AN AGENCY BECAUSE THE NSC IS AN ESTABLISHMENT IN THE EXECUTIVE BRANCH AND EXERCISES SUBSTANTIAL INDEPENDENT AUTHORITY SUCH THAT IT DOES NOT SOLELY RENDER ADVICE AND ASSISTANCE TO THE PRESIDENT ......................................... 700
 A. The NSC Meets The First Prong Of The Agency Test Because It Is An Establishment In The Executive Branch That Has A Separate Staff And A Firm Structure ................................................ 700
 B. The NSC Meets The Second Prong Of The Agency Test Because It Exercises Substantial Independent Authority Through The Performance Of The Traditional Agency Tasks Of Rulemaking And Adjudication, And Because It Performs Many Functions Independently Of the President 701
 1. The NSC Performs The Traditional Agency Functions Of Rulemaking And Adjudication ........................................ 701
 2. The NSC Exercises Substantial Authority Independently Of The President In Key Policy Areas ................................ 702
 III. THE COURT'S FINDING THAT THE NSC IS AN AGENCY FOLLOWS THIS CIRCUIT'S PRECEDENT ..................................... 703
 IV. IN FINDING THAT THE NSC IS AN AGENCY, SUBJECT TO THE FOIA, THE COURT HOLDS THAT THE NSC MUST MAINTAIN AND PRESERVE ITS RECORDS IN ACCORDANCE WITH THE FEDERAL RECORDS ACT, EXCEPT WHEN HIGH LEVEL OFFICIALS OF THE NSC ACT SOLELY TO ADVISE AND ASSIST THE PRESIDENT. IN THAT LIMITED CIRCUMSTANCE, THE PRA, RATHER THAN THE FRA SHALL APPLY ......................................... 704
 V. THE NSC HAS FAILED TO PROVIDE A REASONABLE EXPLANATION AS TO WHY IT HAS SUDDENLY DECLARED THAT IT IS NOT AN AGENCY ......................................... 706
 VI. THE COURT'S FINDING THAT THE NSC IS AN AGENCY DOES NOT UNCONSTITUTIONALLY INTRUDE ON THE POWERS OF THE PRESIDENT, BECAUSE APPLYING THE FOIA TO THE NSC WOULD NOT CAUSE UNDUE DISCLOSURE OF SENSITIVE NATIONAL SECURITY DOCUMENTS ................................................ 706
CONCLUSION .................................................... 707
EXHIBIT A: PRESIDENT CLINTON'S MEMORANDUM
 A. MEMORANDUM OF PRESIDENT CLINTON ON "ACCESS TO NSC RECORDS" DATED MARCH 24, 1994 ......................... 708
EXHIBIT B: NATIONAL SECURITY COUNCIL MEMORANDA
 A. MEMORANDUM OF WILLIAM H. ITOH, NATIONAL SECURITY COUNCIL EXECUTIVE SECRETARY, ON "INSTRUCTIONS ON PRESIDENTIAL STATUS OF THE NATIONAL SECURITY COUNCIL AND REVISED DISCLOSURE AND DISPOSITION POLICY" DATED MARCH 25, 1994 ......................... 709
 B. MEMORANDUM OF WILLIAM H. ITOH, NATIONAL SECURITY COUNCIL EXECUTIVE SECRETARY, ON "RECORDKEEPING GUIDANCE" DATED MAY 8, 1993 ............................. 711
EXHIBIT C: GUIDELINES FOR COMPONENTS OF THE EXECUTIVE OFFICE OF THE PRESIDENT
 A. LETTER FROM JASON R. BARON, ATTORNEY FOR UNITED STATES DEPARTMENT OF JUSTICE, TO MICHAEL TANKERSLEY, ATTORNEY FOR PUBLIC CITIZEN LITIGATION GROUP 715
 B. OFFICE OF ADMINISTRATION'S MEMORANDUM ON "DIRECTIVE ON RECORDS MANAGEMENT OF ELECTRONIC COMMUNICATIONS" ................................................ 715

C. OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE'S MEMORANDUM ON "ELECTRONIC COMMUNICATIONS SYSTEMS".................................................... 728

D. OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE'S MEMORANDUM ON "ELECTRONIC MAIL MODIFICATIONS"... 732

E. OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE'S MEMORANDUM ON "MONITORING ELECTRONIC MAIL"...... 734

F. OFFICE OF SCIENCE AND TECHNOLOGY POLICY'S MEMORANDUM ON "ELECTRONIC COMMUNICATIONS SYSTEMS"....... 734

G. OFFICE OF MANAGEMENT AND BUDGET'S MEMORANDUM ON "NEW RECORDKEEPING GUIDANCE" .......................... 738

H. OFFICE OF NATIONAL DRUG CONTROL POLICY'S MEMORANDUM ON "NEW RECORDKEEPING GUIDANCE" ............... 739

I. COUNCIL ON ENVIRONMENTAL QUALITY'S MEMORANDUM ON "NEW RECORD–KEEPING DIRECTIVE ISSUED"........... 739

EXHIBIT D: PROPOSED REGULATIONS ISSUED BY THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION............................ 740

## INTRODUCTION

Despite a long history of acting as an "agency," and after admitting it was an agency, and thus subject to the Federal Records Act in this litigation, and notwithstanding a long practice of processing records pursuant to the Freedom of Information Act, the President and the Executive Secretary of the National Security Council suddenly changed course in 1994 declaring that the National Security Council is not an agency and thus not subject to the Federal Records Act. (Copies of the declarations are attached hereto and made a part hereof as Exhibit A, Mem. of President Clinton on "Access to NSC Records" dated March 24, 1995, and Exhibit B, Mem. of William H. Itoh, National Security Council Executive Secretary, on "Instructions on Presidential Status of the National Security Council and Revised Disclosure and Disposition Policy" dated March 25, 1994). In doing this on March 24 and 25, 1994, (*See* Exhibits A and B), the Defendants would have the Court ignore the facts that the National Security Council ("NSC") performs rulemaking and adjudication and functions independently of the President in many areas. Moreover, the NSC has operated as an agency, subject to the Freedom of Information Act, which requires that it must maintain and preserve its records in accordance with the Federal Records Act.

In particular, the Defendants contend that the NSC it not an agency, because its sole function is to advise and assist the President. The Court finds, however, that this contention is incorrect because the NSC performs traditional agency functions and operates independently of the President in many areas. Moreover, their contention that this decision will intrude on the exercise of Presidential powers and responsibilities is also wrong because Congress, in enacting the Freedom of Information Act ("FOIA"), specifically provided that material relating to national security shall not be disclosed.

In this case, the Plaintiffs claim that the Defendants are barred from asserting that the NSC is not an agency, because the Defendants conceded that it is an agency in the two prior Court of Appeals' opinions. *See Armstrong v. Bush,* 924 F.2d 282 (D.C.Cir. 1991); *Armstrong v. Executive Office of the President,* 1 F.3d 1274 (D.C.Cir.1993). In addition, the NSC has stated that:

> The NSC does ... acknowledge that documents received or created pursuant to the inter-agency process of the NSC are agency records for the purposes of the FOIA....

(Joint Statement of Facts ¶ 171 (December 8, 1992)).

The Plaintiffs also claim that the NSC is an agency because the NSC is an establishment in the Executive Branch that exercises authority independently of the President by performing adjudicatory and rulemaking functions and by performing duties in many key areas. Last, the Plaintiffs assert that a finding by the Court that the NSC is an agency does not raise any constitutional concerns because the FOIA exempts from dis-

closure documents that relate to sensitive national security matters.

Upon a careful consideration of the facts of this case, the Court concludes that the NSC is an agency, subject to the FOIA, and that it must maintain and preserve its records in accordance with the Federal Records Act, except when high level officials of the NSC are acting solely in their capacity to advise and assist the President. Consequently, the Court shall declare the NSC's recently changed guidelines[1], classifying its records as "Presidential" Records, contrary to history, past practice and the law. (A copy of the old guidelines that were revoked by the March 25, 1994 declaration is attached hereto and made a part hereof as Exhibit B). Moreover, the Archivist shall be directed to perform her obligations with respect to NSC records under the Federal Records Act and to do so without any further delay as this case is important to the nation and the very credibility of this and future administrations.

## PROCEDURAL HISTORY

This case was filed in 1989 at the close of President Reagan's Administration by journalist Scott Armstrong, the National Security Archive and several other individuals and organizations claiming, *inter alia*, that the President, the Archivist, and the NSC's recordkeeping practices failed to comply with the Federal Records Act and the Presidential Records Act.

That same year, this Court held as a preliminary matter that the President's and the NSC's compliance with the Federal Records Act and the Presidential Records Act was judicially reviewable. *Armstrong v. Bush*, 721 F.Supp. 343 (D.D.C.1989). However, since there were some unresolved factual issues with respect to the Defendants' com-

pliance with those recordkeeping statutes, this Court denied the Defendants' Motion to Dismiss the Complaint, or in the alternative for Summary Judgment, and allowed the parties to proceed with discovery. *Armstrong v. Bush*, 721 F.Supp. 343 (D.D.C. 1989). At that stage in the litigation, the Court did not address the substantive question of whether the NSC's recordkeeping guidelines appropriately distinguished between Federal and Presidential Records.

On appeal, the Court of Appeals for this Circuit affirmed this Court's ruling by agreeing that the adequacy of the NSC's recordkeeping guidelines was judicially reviewable pursuant to the Federal Records Act. *Armstrong v. Bush*, 924 F.2d 282, 291–93 (D.C.Cir.1991). However, the Court of Appeals remanded for a further development of the record to determine whether the NSC's electronic recordkeeping guidelines were consistent with law. *Id.*

This Court on remand[2] ruled on January 6, 1993, *inter alia*, that the Executive Office of the President's management of their electronic records violated the law because not all the pertinent information from the electronic records was being saved on hard copy or paper. *Armstrong v. Executive Office of the President*, 810 F.Supp. 335, 341–42 (D.D.C.1993).

Thereafter, another appeal was taken in which the Court of Appeals for this Circuit held that the NSC's guidelines that initially categorize its records as either a Federal Record or a Presidential Record were judicially reviewable and, accordingly, remanded to this Court to determine whether the NSC's recordkeeping guidelines inappropriately classify some documents as Presidential Records rather than Federal Records.[3] *Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1278, 1296 (D.C.Cir.1993).

---

**1.** Although the guidelines have also been labeled as "guidance," the Defendants offer no definitive explanation that there is a difference between the terms "guidelines" and "guidance." (Tr. of Motions Hearing at 66 ¶¶ 15–25 (November 16, 1994)). Therefore, the Court shall refer to them as "guidelines" having the force of law.

**2.** Prior to this Court's ruling on remand, the Defendants amended their Complaint. The new Complaint dropped the President as a Defendant and added, *inter alia*, the Executive Office of the

President as a Defendant. (*See* Third Amended Compl. ¶¶ 13–15).

**3.** In response to this Court's decisions and the Court of Appeals' affirmance, new recordkeeping guidelines were issued for the major components of the Executive Office of the President. (A copy of the guidelines is attached hereto and made a part hereof as Exhibit C; *see also* Letter from Jason R. Baron, Attorney, United States Department of Justice, to Michael E. Tankersley, Attorney, Public Citizen Litigation Group, dated July

After the Court of Appeals' remand, President Clinton stated in a March 24, 1994 memorandum to Anthony Lake and William Itoh that he was advised of this case and the Government's legal position herein. (Exhibit A). Further, President Clinton's memorandum directed, *inter alia*, that the NSC:

> Establish procedures for access by the public to appropriate NSC records of the current Administration.[4]

However, the next day, on March 25, 1994, NSC Executive Secretary William Itoh issued a written memorandum, which was not wholly consistent with what the President himself stated above. (Joint Statement of Facts ¶ 53; Exhibit B). Mr. Itoh stated that the NSC is not an "agency" and that all of its records are Presidential Records, and thus not subject to the FOIA. *Id.* Accordingly, the Defendants' memorandum asserts that the NSC may classify all of its records solely under the Presidential Records Act. *Id.*

### STATEMENT OF THE QUESTION PRESENTED

Whether a government entity, namely the NSC, which has historically treated itself as an agency, and has engaged in a multitude of functions independently of "advising and assisting the President," just like other components of the Executive Office of the President, which admittedly are "agencies" subject to the Freedom of Information Act[5] and the Federal Records Act, can unilaterally after many years of treating itself as an agency, suddenly change its designation without offering a reasoned explanation for the sudden change, and thus declare that it is no longer an "agency?"[6]

If the NSC's declaration that it is not an "agency" is true, then it may classify all of its records solely as Presidential Records. On the other hand, if the Court finds that the NSC is an "agency," the NSC's documents would be subject to the FOIA and it would have to maintain and preserve its records in accordance with the Federal Records Act. Accordingly, the Archivist would be required to fulfill her duties as prescribed by the Federal Records Act.

This case is not a political question but one of statutory construction, and it is one requiring deference to a longstanding practice

---

15, 1994). These new guidelines cover the following major components of the Executive Office of the President: (1) the Office of Administration; (2) the Office of the United States Trade Representative; (3) the Office of Science and Technology Policy; (4) the Office of Management and Budget; (5) the Office of National Drug Control Policy; and (6) the Council on Environmental Quality. (Exhibit C).

Also in response to this litigation, the National Archives and Records Administration ("NARA") finally proposed new regulations applicable to all Federal agencies. 59 Fed.Reg. 13906 (March 24, 1994) (A copy of the proposed regulations is attached hereto and made a part hereof as Exhibit D). The NARA's proposed regulations prescribe the management of "Federal records created or received on an E-mail system." *Id.* Moreover, the proposed regulations apply to *"all* Federal government agencies." *Id.* (emphasis added).

The Court notes that the recent guidelines of the Executive Office of the President with respect to the Office of Administration, the Office of the United States Trade Representative, the Office of Science and Technology Policy, the Office of Management and Budget, the Office of National Drug Control Policy and the Council on Environmental Quality, and those of the NARA that were developed as a result of this litigation, are not

now in dispute. (*See, e.g.,* Stipulation and Order of January 27, 1994 at 13–14; Order of June 22, 1994).

4. The Court observes that from a plain reading of the President's own words, the President did not, in reality, act inconsistently with what the Court holds in this case. (*See* Exhibit A).

5. From 1975 until March 25, 1994, the NSC subjected itself to the Freedom of Information Act. (*See* Exhibit B; and pages 31, 33, *infra*).

6. The resolution of the status of the National Security Council will resolve counts II and III of the Plaintiffs' three count Complaint, wherein they assert that the Defendants' recordkeeping guidelines violate the Federal Records Act, and that the Archivist has failed to carry-out her duties under the Federal Records Act. (*See* Third Amended Compl. at ¶¶ 40–47).

Count I is a claim under the Freedom of Information Act. Pursuant to prior stipulations and Court orders, (*see, e.g.* "Stipulation and Order" dated January 27, 1994), the Defendants are currently processing materials pertinent to the Freedom of Information Act claim. Thus, the Plaintiffs' claim under count I is not before the Court at this time.

of an agency. It involves, *inter alia,* a sudden change in position that is not only contrary to law but without any reasoned explanation for the change. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1971), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).

This Judge has the highest regard for the other two coordinate Branches of the Government and would not knowingly intrude on their power and the exercise of their constitutional duty. The same is true of this Court's respect for the institution of the Presidency including our current Commander-in-Chief and his predecessors. However, this is a country of laws and not of persons and no one including the President is above the law as set forth in the Constitution and laws of the States. This is also why we have independent Courts with the power of Judicial Review going back to *Marbury v. Madison,* 5 U.S. 137, 2 L.Ed. 60 (1803).

■ To settle the matter in accordance with the Court of Appeals' remand, the parties filed the instant Cross–Motions to Dismiss, or, in the Alternative, for Summary Judgment,[7] Oppositions, and Replies thereto, which are now before the Court.[8] In light of the papers filed by the parties, the underlying law, the entire record herein, and oral argument, the Court shall grant the Plaintiffs' Motion for Summary Judgment, and deny the Defendants' Motion.

### FACTS

Since the early 1980's, the NSC has used electronic mail systems to manage information. (Joint Statement of Facts at ¶ 42). All NSC staff members have access to these systems, which allow users electronically to transmit mail, generate calendars of appointments and meetings, create and edit memoranda, and transfer files and documents. These electronic communications systems contain organizational, functional, policy, procedural, and operational information regarding the NSC. When employing these electronic systems, NSC staff members are not instructed to distinguish between "Presidential" and "Federal" Records. (Responses of NSC to Plaintiffs' Requests for Admissions, RFA 1–11 at 61 (1994)). Copies of the information from these electronic systems are regularly copied onto "backup tapes," which contain information created during the Reagan, Bush, and Clinton administrations. (*See* Joint Statement of Facts ¶ 46 (October 3, 1994)). Currently, the "backup tapes" are being retained by the Defendants in accordance with previous Court-ordered injunctions. According to the NSC, since it is not

---

7. Although the parties' briefs exceed the page limitations prescribed in the Local Rules, the parties filed along with their briefs, Motions to exceed the page limitations. To allow the parties an opportunity to fully brief their positions in this case, and in the interests of justice, the Court shall grant the Motions.

 Moreover, the Court shall treat the parties' Motions as those for Summary Judgment for two reasons. First, the parties' Motions refer to matters outside the scope of the pleadings. According to Rule 12 of the Federal Rules of Civil Procedure, whenever "matters outside the pleading are presented ... the motion shall be treated as one for summary judgment." Fed.R.Civ.Pro. 12(b)(6). Second, as required by Local Rule 108(h), the parties have filed statements of material facts as to which there is no genuine issue.

8. The Defendants also filed, on October 7, 1994, a Motion to Withdraw and Amend Prior Responses to Requests for Admissions wherein the National Security Council previously characterized some of its functions as that of an "agency," and asserted that the National Security Council is subject to both the Federal Records Act and the Freedom of Information of Act.

With respect to admissions, Rule 36(b) of the Federal Rules of Civil Procedure provides that: [T]he court may permit withdrawal or amendment [of admissions] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

Fed.R.Civ.Pro. 36(b). According to the Rule, permission to withdraw is committed to the discretion of the Court. *See Id.*

In the exercise of its discretion and in the interests of justice, the Court shall deny the Motion because the Defendants filed this Motion *after* discovery was completed, *after* the Plaintiffs filed their pleadings relying on the admissions, and *after* the parties entered into a joint statement of undisputed facts referring to the admissions. Also, to allow withdrawal of these admissions now would result in prejudice because discovery would have to be reopened to allow the Plaintiffs an opportunity to obtain evidence on the matters covered in the responses.

an "agency" as defined in the Federal Records Act or the FOIA, the records created on these electronic systems are not agency records that would be subject to the Federal Records Act. (Exhibit B).

Notwithstanding the NSC's current declaration that it is not an agency, in previous pleadings filed with the Court, the NSC has stated that it performs the dual functions of advising and assisting the President, and performs independent functions. (Joint Statement of Facts ¶ 171 (December 8, 1992); *see* Exhibit B). Moreover, the Defendants have previously acknowledged that "documents received or created pursuant to the inter-agency process of the NSC are agency records for the purposes of the FOIA...." (Joint Statement of Facts ¶ 172 (December 8, 1992) (citing *Armstrong v. Bush*, 924 F.2d 282, 286 n. 2 (D.C.Cir.1991))).

### A. *The Recordkeeping Statutes*

■■■ Prior to the NSC's March 25, 1994 declaration that it is not an agency, the NSC's recordkeeping guidelines distinguished between Federal and Presidential Records. *E.g., Armstrong v. Bush*, 924 F.2d 282 (D.C.Cir.1991). The Federal Records Act ("FRA") governs a federal agency's duties with respect to managing Federal Records. According to the FRA, the head of each agency is to:

[M]ake and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities.

44 U.S.C. § 3101. Moreover, agency heads are to "establish and maintain an active, continuing program for ... economical and efficient [records] management," and "establish safeguards against the removal or loss of records [the agency head] determines to be necessary and required by regulations of the Archivist." *Id.* at 3102, 3105. Records that are subject to the Federal Records Act are immediately subject to the FOIA. *See* 5 U.S.C. § 552. Further, recordkeeping guidelines promulgated under the FRA are subject to judicial review. *Armstrong v. Bush*, 924 F.2d 282, 292–92 (D.C.Cir.1991).

■■■ To dispose of a Federal Record, an agency must first garner the approval of the Archivist. The Archivist is vested with the duty to determine if a record is suitable for destruction by deciding if the record has "sufficient administrative, legal, research, or other value to warrant [its] continued preservation." 44 U.S.C. § 3303a. Consequently, documents that qualify as a Federal Record are subject to specific guidelines and procedures in their management and disposal.

■ In contrast to Federal Records, the President has greater control over documents generated during his term of office that qualify as a Presidential record. *See* 44 U.S.C. § 2204. Under the Presidential Records Act ("PRA"):

[T]he President *shall* take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records....

44 U.S.C. § 2203 (emphasis added).

The PRA further provides that the President may only dispose of his Presidential Records after he "obtains the views, in writing, of the Archivist concerning the proposed disposal of such Presidential Records," and the Archivist consults with Senate and House Committees "with respect to any proposed disposal of Presidential Records." *Id.*

In addition, after the President leaves office, the PRA provides that:

[T]he Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President. The Archivist shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this Act....

[Moreover,] [t]he Archivist is authorized to dispose of such Presidential records

which he has appraised and determined to have insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation. Notice of such disposal shall be published in the Federal Register at least 60 days in advance of the proposed disposal date. Publication of such notice shall constitute a final agency action for purposes of review under chapter 7 of title 5, United States Code.

*Id.* In addition, before the conclusion of his term of office, the President is to specify a duration, "not to exceed twelve years, for which access shall be restricted with respect to information, in a Presidential Record." The restriction on access to Presidential Record material applies to certain categories of information contained in a Presidential Record, such as personnel and medical files, the disclosure of which would clearly constitute an unwarranted invasion of personal privacy, or information involving confidential advice between the President and his advisors, etc. 44 U.S.C. § 2204.

## B. *The Structure Of The National Security Council*

The National Security Act of 1947 established the NSC. 50 U.S.C. § 402. Pursuant to the Reorganization Plan No. 4 of 1949, the NSC was transferred to the Executive Office of the President ("EOP"). As an entity within the EOP, the NSC has a separate budget and staff, and a firm structure.

From fiscal years 1983 to 1995, the NSC's budget has ranged from approximately $4,000,000 to $7,000,000. (*See* Budget of the United States Government (1985); Mem. from J. Robert Manzanares, Director of Administration, to Robert S. Dotson, Chief, Air Force Branch of National Security Division Office of Management and Budget, entitled "FY 1995 Submission" (1993)). In fact, last week President Clinton transmitted his budget to Congress requesting $6,648,000 for the operation of the NSC. (Fiscal Year 1996 Budget Submission (February, 1995)).

Pursuant to the National Security Act of 1947, the NSC has its own staff, consisting of approximately one hundred fifty individuals drawn from various executive departments

and agencies, and from outside the government. (Defs.' Resp. and Supplemental Resp. to Inter. No. 2). Internal documents created before March, 1994, state that the NSC staff acts as members of an agency. (Letter from Stephen J. Rademaker, NSC Deputy Legal Adviser, to Mark M. Richard, Deputy Assistant Attorney General, United States Department of Justice (August 26, 1992); NSC Mem. on "United States of America v. Caspar Weinberger" (1992)).

With respect to its structure, the NSC, pursuant to various Presidential Directives, is divided into a three-tiered system of committees or groups consisting of: (1) a principals' committee; (2) a deputies' committee; and (3) interagency working groups.

Various statutes, regulations, Executive Orders and Directives prescribe the functions that the NSC performs independently of the President, such as rulemaking and adjudication, and its role in specific policy areas. *E.g.,* National Security Act of 1947 §§ 102, *et seq.;* Exec. Order No. 12,333, 46 Fed.Reg. 59942 (1981); National Security Decision Directive 65 (1982).

### *DISCUSSION*

This case comes before the Court on Cross–Motions for Summary Judgment. Summary judgment shall be rendered upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1032 (D.C.Cir.1988). For the reasons set forth below, the Court shall grant Summary Judgment in favor of the Plaintiffs.

### I. *THE "LAW OF THE CASE" DOCTRINE DOES NOT BAR THE COURT FROM DECIDING THE STATUS OF THE NSC BECAUSE THE ISSUE HAS NOT BEEN PREVIOUSLY DECIDED.*

Before the Court can address the gravamen of this dispute, to wit, whether the NSC

is an agency, it must first respond to the Plaintiffs' contention that since the NSC has not previously challenged the two prior Court of Appeals' cases allegedly acknowledging that the NSC is an agency, this Court is now barred from deciding the issue under the "law of the case" doctrine.

The "law of the case" doctrine states that:

> [A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case ... and the parties are deemed to have waived the right to challenge that decision at a later time.

*Palmer v. Kelly,* 17 F.3d 1490, 1494 (D.C.Cir. 1994); *Williamsburg Wax Museum v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C.Cir.1987) (internal citation omitted). However, if an issue has not previously been decided, the "law of the case" doctrine does not apply. *Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1149 n. 18, 59 L.Ed.2d 358 (1979) (citing *In re Sanford Fork & Tool Co.,* 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895)); *see Friends of the Earth v. Reilly,* 966 F.2d 690, 696 n. 7 (D.C.Cir.1992). Contrary to the Plaintiffs' arguments, the Court finds that since the issue of the NSC's status has not been decided in the two prior Court of Appeals' decisions, the "law of the case" doctrine does not apply to the instant case, and therefore, this Court is not precluded from deciding the issue.

The first appeal, *Armstrong v. Bush,* 924 F.2d 282 (D.C.Cir.1991), did not decide the issue because the question of whether the NSC is an "agency," subject to the FOIA, first arose only after the Court of Appeals' decision. (*See* Pls.' Opp'n to Defs.' Mot. for Summ.J. at 50–56 (July 6, 1992)).

Likewise, the Court of Appeals in *Armstrong v. Executive Office of the President,* 1 F.3d 1274 (D.C.Cir.1993), the second appeal, did not decide the issue either. In remanding back to this Court, the Court of Appeals in that case specifically stated that the issue of the NSC's status as an agency "has never been definitely resolved." *Id.* at 1296.

Since the NSC's status as an "agency" has never been previously decided, the Court finds that the "law of the case" doctrine does not bar this Court's determination of the issue.

The Court shall now turn to the merits of the instant dispute.

## II. THE COURT FINDS THAT THE NSC IS AN AGENCY BECAUSE THE NSC IS AN ESTABLISHMENT IN THE EXECUTIVE BRANCH AND EXERCISES SUBSTANTIAL INDEPENDENT AUTHORITY SUCH THAT IT DOES NOT SOLELY RENDER ADVICE AND ASSISTANCE TO THE PRESIDENT.

To be an agency, an entity must satisfy a two pronged analysis. First, an entity must be an "establishment in the executive branch." 5 U.S.C. § 552(f). Second, the entity must exercise "substantial independent authority" to the extent that its role is not limited solely to giving advice and assistance to the President. *Soucie v. David,* 448 F.2d 1067 (D.C.Cir.1971); *see* 5 U.S.C. § 551(1) and 552(f).

In the instant case, the Court finds that both prongs of the agency test are met as applied to the NSC.

### A. The NSC Meets The First Prong Of The Agency Test Because It Is An Establishment In The Executive Branch That Has A Separate Staff And A Firm Structure.

According to the law of this Circuit, an entity that has a separate staff and a firm structure is an "establishment in the executive branch" and, therefore, meets the first prong of the agency test. *Meyer v. Bush,* 981 F.2d 1288, 1293, 1295–96 (D.C.Cir.1993). In examining the nature of the NSC, the Court concludes that since the NSC has a separate staff and a firm structure, it is an establishment in the executive branch.

First, the NSC by statute was provided with a separate staff. 50 U.S.C. § 402(c) (the NSC "shall have a staff"). In fact, during the past three Presidential administrations, there have been approximately one

hundred fifty individuals on the NSC staff. (Defs.' Resp. and Supplemental Resp. to Inter. No. 2).

Second, the NSC has a firm structure. The NSC was created by the issuance of an affirmative statutory mandate when Congress stated that "[t]here is established a council to be known as the National Security Council." 50 U.S.C. § 402(a). In its current set-up, the NSC has twenty-five separate interagency working groups operating within its structure and, as indicated by the NSC's organizational chart, the NSC staff is organized into separate offices responsible for particular regions or functions. In addition, the NSC contains multiple "interagency working groups" that report to the NSC. (Joint Statement of Facts ¶ 23). Finally, the Court notes that the NSC has a separate budget, which now totals in excess of $6,000,-000. (*See* Budget of the United States Government (1985); Mem. from J. Robert Manzanares, Director of Administration, to Robert S. Dotson, Chief, Air Force Branch of National Security Division Office of Management and Budget, entitled "FY 1995 Submission" (1993)).

Since the NSC has a separate staff and a firm structure, as indicated by the foregoing facts, the Court concludes that the NSC is an "establishment in the executive branch" and, therefore, satisfies the first prong of the agency test.

**B. *The NSC Meets The Second Prong Of The Agency Test Because It Exercises Substantial Independent Authority Through The Performance Of The Traditional Agency Tasks Of Rulemaking And Adjudication, And Because It Performs Many Functions Independently Of The President.***

The second prong of the agency test was established by this Circuit in *Soucie v. David*, 448 F.2d 1067 (D.C.Cir.1971). In that case, the Court of Appeals had to decide whether the Office of Science and Technology ("OST") is an agency subject to the FOIA. *See Id.* at 1070–71. The Court held that despite the fact that the OST advised and assisted the President, it is an agency be-

cause it performed additional independent functions. *Id.* at 1074.

In finding the OST to be an agency, the Court of Appeals developed what has become known as the "sole function" test. According to this test, the second prong of the agency test, an entity that exercises substantial independent authority aside from advising and assisting the President is an agency. *Soucie v. David*, 448 F.2d 1067 (D.C.Cir. 1971); *see* 5 U.S.C. 552(f) (citing 5 U.S.C. 551(1)).

It is undisputed that the "sole function" test applies to the instant case. (Defs.' Mot. for Summ.J. at 33–34). The Defendants contend, however, that under that test, the NSC's sole function is to advise and assist the President. *Id.* at 40–53. The Court finds that the Defendants are simply incorrect.

**1. The NSC Performs The Traditional Agency Functions Of Rulemaking And Adjudication.**

First, because the NSC performs rulemaking and adjudication, it exercises authority independently of the President, the NSC satisfies the sole function test. Under the Administrative Procedure Act ("APA"), entities that perform rulemaking and adjudicatory functions are considered agencies. *See* 5 U.S.C. §§ 551, 553, 554. A close examination of the facts of this case indicates that the NSC performs the same adjudicatory and rulemaking functions that are indicative of a classic "agency" under the APA.

In publishing its regulations in the Code of Federal Regulations, the NSC has performed rulemaking. By statute, only the regulations that become published in the Code of Federal Regulations are considered agency documents that have "legal effect." 44 U.S.C. § 1510(a). Consequently, regulations that become published in the Code of Federal Regulations are presumptively deemed rules of an agency. *See Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C.Cir.1986) (Scalia, J.); *accord American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109, 1112 (D.C.Cir.1993). In this case, the NSC has

performed rulemaking by issuing many regulations that have been subsequently published in the Code of Federal Regulations.

The NSC has, several times, issued regulations governing procedures for requesting information that were published in the Code of Federal Regulations. *See generally,* 32 C.F.R. §§ 2101–2103. Moreover, in conjunction with the Office of Science and Technology Policy, the NSC has issued regulations, published in the Code of Federal Regulations, governing national security and emergency preparedness. 47 C.F.R. §§ 201–216. Last, pursuant to an Executive Order, the NSC has issued a circular prescribing the procedures for handling telecommunications systems, which has also been published in the Code of Federal Regulations. *See* 47 C.F.R. § 213.1(b).

In addition to numerous rulemaking functions, the NSC also performs various adjudicatory functions. With respect to the declassification of national security information, the NSC is empowered to review and overturn declassification decisions made by other agencies. Exec.Order No. 12,356, 47 Fed. Reg. 14874 (1982); 22 C.F.R. § 9.16. With respect to the FOIA, the FOIA regulations of other agencies require that requests for NSC or White House documents be referred to the NSC for review and determination. 32 C.F.R. §§ 286.7; 518.26; 701.8(i). In accordance with this authority, the NSC staff adjudicate approximately 1,500 FOIA and mandatory review requests each year. (Dep. of David Van Tassel, NSC Director of Access Management at 23–24, ¶¶ 19–18). In addition, the NSC staff has primary and authoritative review responsibility regarding FOIA requests for material classified and maintained by the NSC, by the President, or by his staff where there is an NSC interest. 32 C.F.R. § 2101.41(a)(1). With respect to government security agreements, the NSC reviews and approves the language used in the agreements in order to protect classified information. *See* 32 C.F.R. § 2003.20; 48 Fed. Reg. 40849. Moreover, the NSC makes decisions on export license applications that raise nuclear non-proliferation or national security issues. *See* 56 Fed.Reg. 6701.

As the above facts indicate, the NSC performs the classic agency functions of rulemaking and adjudication. In performing such functions, the NSC exercises authority independently of the President and thereby satisfies the sole function test.

### 2. The NSC Exercises Substantial Authority Independently Of The President In Key Policy Areas.

In addition to satisfying the sole function test by performing the traditional agency functions of rulemaking and adjudication, the NSC also satisfies the test by virtue of its role in many different policy areas. As required by the sole function test, the NSC in each of these areas operates independently of the President.

First, the NSC plays a role in Intelligence independent of the President. By statute, the NSC is the head of the Central Intelligence Agency ("CIA"). National Security Act of 1947, ch. 343, Pub.L. 253 (1947). According to the statute, the CIA is "to perform such ... functions and duties ... affecting the national security as the National Security Council may from time to time direct." *Id.* More importantly, pursuant to Executive Order, the NSC is "the highest Executive Branch entity that provides review, guidance and direction to the conduct of all national foreign intelligence, counterintelligence, special activities, and attendant policies and programs." Exec.Order No. 12,-333, 46 Fed.Reg. 59942 (1981).

Second, the NSC plays a role in protecting National Security Information independent of the President. In the area of national security, an information security program governs the responsibilities of federal agencies with respect to classifying, declassifying, and safeguarding sensitive national security information. Exec.Order No. 12,356, 47 Fed. Reg. 14881 (1982). The NSC is charged with providing "overall policy direction" for this program. *Id.* Furthermore, the NSC is responsible for providing overall policy direction for a National Industrial Security Program, which controls the release of classified information to contractors. Exec.Order No. 12,829. Also, the NSC reviews regulations governing other agencies' security prac-

tices, and conducts nearly 1,000 mandatory declassification reviews. *See Id.;* (Dep. of David Van Tassel, NSC Director of Access Management, at 23–24, ¶¶ 19–18).

Moreover, the NSC plays a role in Telecommunications independent of the President. In 1963, the President established a National Communications System to link the communication facilities of the federal agencies and to conduct planning necessary to provide communications in national emergencies. (President Kennedy's "Memorandum to the Heads of Executive Departments and Agencies" (1963)). Pursuant to an Executive Order, the NSC was given the responsibility for directing, coordinating and developing policies and programs of the National Communications System. Exec.Order No. 12,046. By virtue of a 1990 Directive, an NSC committee is responsible for federal policies with respect to the security of telecommunications systems. National Security Directive (1990).

Furthermore, an Executive Order and various Directives have vested the NSC with overall responsibility for a national security emergency preparedness policy. *See* Exec. Order No. 12,656; National Security Decision Directive 47 (1982); National Security Decision Directive 314 (1988).

In addition, the NSC plays a role in Arms Control Verification independent of the President. Under President Reagan, the NSC was responsible for monitoring arms control compliance and overseeing START and INF verification programs. National Security Decision Directive 65 (1982). Under President Bush, NSC committees were to provide guidance to United States' inspection teams and to "coordinate verification research and development efforts." (NSC Mem. on "Verification Technology Working Group" (1990)).

The NSC also plays a role in Nonproliferation independent of the President. An NSC sub-group is responsible for reviewing any export licenses that propose to export items that potentially involve nuclear explosives. 42 U.S.C. § 2139a(c). Interagency disputes over such licenses are resolved through the use of NSC procedures. 56 Fed.Reg. 6701 § 5.a(ii) (1991). Further, pursuant to a National Security Directive, the NSC reviews export licenses concerning nonproliferation

policy when requested by another agency. National Security Directive 53.

Finally, the NSC plays a role in Public Diplomacy independent of the President. The NSC coordinates and directs international broadcasting and public affairs to generate support for national security objectives. (NSC Mem. on "NSDD–77 on Public Diplomacy" (1985)). In addition, the NSC provides "aid, training and organizational support for foreign governments and private groups." *Id.*

As the above facts indicate, the NSC exercises substantial authority independently of the President. Accordingly, under the sole function test, the Court finds that the NSC is an agency.

### III. THE COURT'S FINDING THAT THE NSC IS AN AGENCY FOLLOWS THIS CIRCUIT'S PRECEDENT.

This Circuit has, several times, applied the *Soucie v. David* sole function test to other entities within the Executive Office of the President and found them to be agencies. *See, e.g., Sierra Club v. Andrus,* 581 F.2d 895 (D.C.Cir.1978), *rev'd on other grounds,* 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979); *Pacific Legal Found. v. Council on Envtl. Quality,* 636 F.2d 1259 (D.C.Cir.1980).

In *Sierra Club,* the Court of Appeals held that although the Office of Management and Budget assists the President, it is an agency because it performs additional tasks as well, such as preparing the Budget for Congress. *Sierra Club,* 581 F.2d at 902.

Two years later, in *Pacific Legal Foundation,* the Court of Appeals held that the Council on Environmental Quality was an agency. *Pacific Legal Found.,* 636 F.2d at 1263. Although the Council advised the President, it was found to be an agency because, pursuant to Executive Orders, it had additional authority to evaluate federal programs. *Id.*

As indicated by *Soucie, Sierra Club* and *Pacific Legal Foundation,* the Court need only find that an entity perform one additional role beyond rendering advice and

assistance to the President in order to declare that an entity is an "agency." In this case, it is obvious that the NSC does more than render advice and assistance to the President. In fact, this case is even easier to decide than the aforementioned Court of Appeals' decisions. Where those prior Court decisions found entities within the EOP to be agencies on the basis of just one or more additional functions beyond advising and assisting the President, the NSC, in this case, exercises authority independently of the President in numerous areas.

Nevertheless, despite the facts of this case and the legal precedent of this Circuit, the Defendants argue that the NSC is not an agency, but rather an "alter ego" of the President, in view of such cases as *Meyer v. Bush*, 981 F.2d 1288 (D.C.Cir.1993).[9] In *Meyer*, the Court found that then-President Reagan's Task Force on Regulatory Relief was not an agency because of various factors. In particular, the Court noted that because the Task Force did not direct anyone, did not have substantial independence, was not expected to resolve disputes, and lacked a separate staff, it was not an independent entity. *Id.* at 1292–95.

■ However, this case is readily distinguishable from *Meyer* for several reasons. First, the Task Force in *Meyer* was established by the President acting alone. *Id.* at 1289. The NSC, however, was created by statute. 50 U.S.C. § 402(a). Thus, the President has no authority to eliminate, *sua sponte*, the NSC. Second, crucial to the *Meyer* Court's decision was a finding that the Task Force did not have a separate staff. *Meyer*, 981 F.2d at 1295. In contrast, the

NSC, by statute, was provided with a separate staff. 50 U.S.C. § 402(c). More importantly, the Task Force in *Meyer* was also found not to be an agency, in part, because it was not expected to resolve disputes without presenting the disputes to the President directly. *Meyer*, 981 F.2d at 1294. However, the NSC has independent adjudicatory powers. As indicated *supra*, the NSC adjudicates in many areas such as declassification determinations, export licensing, and FOIA requests without the participation of the President.

Because the NSC was created by statute, has a separate staff, and exercises independent adjudicatory power, the NSC is unlike the Task Force in *Meyer* and, instead, is like the entities in *Sierra Club* and *Pacific Legal Foundation* that were found to be agencies. Thus, according to this prior precedent, the NSC is an agency.

## IV. *IN FINDING THAT THE NSC IS AN AGENCY, SUBJECT TO THE FOIA, THE COURT HOLDS THAT THE NSC MUST MAINTAIN AND PRESERVE ITS RECORDS IN ACCORDANCE WITH THE FEDERAL RECORDS ACT, EXCEPT WHEN HIGH LEVEL OFFICIALS OF THE NSC ACT SOLELY TO ADVISE AND ASSIST THE PRESIDENT. IN THAT LIMITED CIRCUMSTANCE, THE PRA, RATHER THAN THE FRA SHALL APPLY.*

In deciding this case, the Court finds that in holding that the NSC is an agency, it must give affect to both the FRA and the PRA.[10]

---

9. The Defendants also argue, incorrectly, that *Rushforth v. Council of Economic Advisers*, 762 F.2d 1038 (D.C.Cir.1985), is controlling. In that case, the Court of Appeals held, in applying the sole function test, that the Council of Economic Advisers was not an agency. *Id.* at 1040, 1041–43.

However, *Rushforth* is clearly inapplicable to the instant case because the Council in *Rushforth* was found not to be an agency, in part, because of its inability to issue regulations. *Id.* at 1043. In contrast, the NSC, in performing its rulemaking functions, described *supra*, has issued regulations. Therefore, the instant case is distinguishable from *Rushforth*.

10. The Court observes that the issue of whether the NSC may maintain records under both the FRA and the PRA was left open by the Court of Appeals in remanding this case to the Court. *See Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C.Cir.1993). On the one hand, the Court of Appeals suggested that it had previously rejected the argument that certain records may not be subject to the FOIA when the NSC is acting in its capacity as an advisor to the President. *See Id.* at 1295 (citing *Ryan v. Department of Justice*, 617 F.2d 781 (D.C.Cir.1980)). On the other hand, the Court of Appeals also stated that this Court was to decide if the NSC's guidelines "inaccurately classify *some* documents as presidential records." *Id.* at 1296–97 (emphasis added). Accordingly, this Court may now decide

The FRA consists of a series of statutes, starting in 1943 with the Disposal of Records Act, ch. 192, 57 Stat. 380, and in 1950 with the Federal Records Act, ch. 849, 64 Stat. 583. Subsequently, these acts were amended by the Government Records Disposal Amendments of 1970, 84 Stat. 320, the Federal Records Management Amendments of 1976, 90 Stat. 2723, and the National Archives and Records Administration Act of 1984, 98 Stat. 2280. *See Armstrong v. Bush,* 924 F.2d 282, 284 n. 1 (D.C.Cir.1991) (citing 44 U.S.C. §§ 2101 *et seq.,* 2901 *et seq.,* 3101 *et seq.,* 3301 *et seq.*) Subsequent to the original passage of the FRA, the PRA was enacted in 1978. *See* 44 U.S.C. § 2201 *et seq.*

■ When faced with two statutes, the general rule is that a repeal by implication is dis-favored. *E.g., Morton v. Mancari,* 417 U.S. 535, 549–50, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *United States v. Hansen,* 772 F.2d 940, 944 (D.C.Cir.1985) (Scalia, J.), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986). Accordingly, a court is to give affect to both statutes, unless the statutes conflict or Congress specifically indicates otherwise. *E.g., Morton,* 417 U.S. at 551, 94 S.Ct. at 2483; *see, e.g., Mail Order Ass'n of America v. United States Postal Serv.,* 986 F.2d 509, 515 (D.C.Cir.1993). In examining both statues, the Court finds that in holding that the NSC is an agency, the Court must recognize both statutes as applied to the NSC.

■ First, the operation of the PRA and the FRA does not conflict because the statutes deal with different categories of records. Under the FRA, records that are subject to the Act are defined as:

> [D]ocumentary materials ... made or received by an agency of the United States Government under federal law or in connection with the transaction of public business and preserved or appropriate for preservation ... as evidence of the ... activities of the Government or because of the informational value of data in them.

44 U.S.C. § 3301. In contrast, records subject to the PRA are defined as:

> [D]ocumentary materials ... created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2). Moreover, the PRA does not apply to "any documentary materials that are ... official records of an agency." *Id.* at § 2201(2)(B)(i). Since the PRA applies to nonagency records, while the FRA applies to agency records, the statutes have distinct applications and do not conflict.

Furthermore, Congress has not indicated that the passage of the PRA repealed the FRA. *See* 44 U.S.C. § 2201 *et seq.* Although the PRA was promulgated after the FRA, neither the legislative history nor the language of the PRA indicate any Congressional intent to overturn the FRA. *Id.* Because the PRA did not repeal the FRA in its passage, and the statutes apply to different categories of records, the Court, under the settled law of the Circuit, must recognize the operation of both statutes as applied to the NSC. Thus, the PRA shall apply to the NSC in certain circumstances, in addition to the FRA.

■ Due to its unique duties, high level officials of the NSC sometimes act not as members of an agency but, solely as advisors to the President. *See, e.g.,* Exec. Order No. 12,333, 46 Fed.Reg. 59942 (1981). In fact, the NSC's previous recordkeeping guidelines recognized this distinction when they segregated records as Presidential and Federal. (Exhibit B). Thus, since the PRA applies to documents that are created by an individual whose "function is to advise and assist the President," 44 U.S.C. § 2201(2), the PRA must apply to NSC officials whenever they act solely to advise and assist the President. In all other circumstances the FRA shall apply to the NSC because it is an agency.

■ Accordingly, under the settled law of this Circuit and the actual practice of the

whether the NSC should classify its records under both the FRA and the PRA.

NSC, the Court holds that the NSC is an agency, subject to the FOIA, that must maintain and preserve its records in accordance with the FRA. However, in the limited circumstance in which a high level official of the NSC acts solely to advise and assist the President, the PRA, rather than the FRA shall apply.

## V. THE NSC HAS FAILED TO PROVIDE A REASONABLE EXPLANATION AS TO WHY IT HAS SUDDENLY DECLARED THAT IT IS NOT AN AGENCY.

Even if the NSC did not perform rulemaking and adjudication, and otherwise exercise substantial authority independently of the President, the Court would still have to set aside the agency's declaration that it is not an agency as arbitrary and capricious.

Whenever an agency changes its position or policy, the general rule is that the agency must "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored...." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1971), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). The rule espoused by *Greater Boston* has been repeatedly applied in this Circuit. *See, e.g., Cross–Sound Ferry Services, Inc. v. I.C.C.,* 934 F.2d 327, 329 (D.C.Cir.1991) (internal citations omitted). Thus, although an agency is free to alter its policies, it must give a satisfactory explanation as to why it has done so. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983); *National Audubon Soc'y v. Hester,* 801 F.2d 405, 408 (D.C.Cir.1986); *see International Fabricare Inst. v. EPA,* 972 F.2d 384, 389 (D.C.Cir.1992); *Federal Election Comm'n v. Rose,* 806 F.2d 1081, 1089 (D.C.Cir.1986).

The Court observes that, while the aforementioned rule concerns judicial review of an agency's change in policy, the seminal issue in this case is whether the NSC is an agency at all. Nevertheless, the Court finds this basic principle of administrative law applicable to the instant case as the NSC has admitted to being, and has operated as, an agency prior to its declaration. In turn, the Court finds that the NSC has failed to give a satisfactory or reasoned explanation as to why it has altered its position regarding its recordkeeping practices by declaring that it is not an agency.

Since 1975, the NSC has operated as an agency by allowing its records to be FOIA accessible. (Exhibit B). Since that time, the NSC has processed hundreds of FOIA requests. (*See* Dep. of David Van Tassel, NSC Director of Access Management at 23–24, ¶¶ 19–18). Moreover, the NSC has previously acknowledged that it is an agency. (Letter from Stephen J. Rademaker, NSC Deputy Legal Adviser, to Mark M. Richard, Deputy Assistant Attorney General, United States Department of Justice (August 26, 1992); NSC Mem. on "United States of America v. Caspar Weinberger" (1992); *see* Joint Statement of Facts ¶ 171 (December 8, 1992)).

Nevertheless, regardless of the NSC's prior admissions and past practice, on March 25, 1994, the NSC declared that it was not an agency and, therefore, could maintain all of its records solely under the Presidential Records Act. (Exhibit A, B). According to this declaration, all of the NSC's records would no longer be subject to the FOIA. *Id.* However, nowhere in the March 25, 1994 declaration is there a reasoned explanation as to the NSC's abrupt change in position. *See Id.* Under the settled law of this Circuit, the NSC must provide a reasoned explanation for this shift. Since the NSC has not done so here, its declaration that it is not an agency must be set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 39, 103 S.Ct. 2856, 2864, 77 L.Ed.2d 443 (1983).

## VI. THE COURT'S FINDING THAT THE NSC IS AN AGENCY DOES NOT UNCONSTITUTIONALLY INTRUDE ON THE POWERS OF THE PRESIDENT, BECAUSE APPLYING THE FOIA TO THE NSC WOULD NOT CAUSE UNDUE DISCLOSURE OF SENSITIVE NATIONAL SECURITY DOCUMENTS.

The Defendants' final argument is that the Court can not find the NSC to be an agency

subject to the FOIA, because such a finding would constitute an unconstitutional intrusion into the powers of the President over foreign and military affairs by causing undue disclosure of documents relating to national security. (Defs.' Mot. to Dismiss, or, in the alternative for Summ.J. at 58 (1994)). This is simply incorrect.

 It is true that, in construing a statute, a court should avoid a construction that raises constitutional problems. *Public Citizen v. Department of Justice*, 491 U.S. 440, 466, 109 S.Ct. 2558, 2573, 105 L.Ed.2d 377 (1989). However, in construing the statute establishing the NSC, a finding that the NSC is an agency subject to the FOIA would not result in an unconstitutional intrusion into the powers of the President for several reasons.

First, the NSC has previously admitted to being an agency. (*See, e.g.,* Joint Statement of Material Facts ¶ 158 (1992)). Thus, the Defendants' argument, that there are constitutional concerns in finding that the NSC is an agency, when the NSC has previously admitted to being an agency, is disingenuous, at best.

Second, the NSC has processed many FOIA requests notwithstanding their current claim that subjecting the NSC to the FOIA would raise constitutional conflicts. In 1966, Congress enacted the FOIA. 5 U.S.C. § 552. Since 1975 until the March 25, 1994 declaration, the NSC has subjected itself to the FOIA. (Exhibit B (citing 32 C.F.R. § 2101.1, 40 Fed.Reg. 7316 (1975))). During those nineteen years, the NSC never asserted that subjecting itself to the FOIA creates constitutional problems.

More importantly, the FOIA itself prevents disclosure of sensitive national security documents, thereby protecting the President from any undue infringement on his authority over national security matters. In enacting the FOIA, Congress specifically provided for nine categories of information that would be exempt from disclosure. In particular, the FOIA exempts from disclosure information falling into any of the following categories: (1) national security; (2) internal agency rules; (3) material that is exempted by another federal statute; (4) trade secrets; (5) inter and intra agency memoranda; (6) personal privacy; (7) law enforcement records; (8) records of financial institutions; and (9) geological or geophysical information. 5 U.S.C. § 552(b)(1)–(9). With respect to the instant case, the FOIA specifically exempts from disclosure documents that relate to sensitive national security issues. 5 U.S.C. § 552(b)(1), (5). Indeed, counsel for the NSC has been unable to name a single instance in which sensitive national security material was released under the FOIA after an agency's invocation of one of the FOIA exemptions. Therefore, because Congress has specifically provided that materials relating to national security affairs shall not be disclosed, the holding of this Court that the NSC is an agency will not interfere with the President's powers over foreign and military matters.

### CONCLUSION

Based on the foregoing, the Court finds that the NSC is an agency subject to the FOIA, and is obligated to preserve all of its records in accordance with the Federal Records Act, except when high level officials of the NSC are acting solely in their capacity to advise and assist the President. The Court further finds that to the extent the NSC's current guidelines allow all of its records to be classified as "Presidential" records, the guidelines are contrary to law. The NSC and the Archivist must adopt new guidelines for the NSC in place of those vacated and nullified on March 25, 1994, so as to ensure that non-Presidential Records are preserved under the Federal Records Act and not destroyed under the guise of the Presidential Records Act.

Obviously, the Court, in issuing this Opinion, does not intend to require Presidential Records or documents, written or electronic, that are designed solely to advise and assist the President to be preserved except as required by the Presidential Records Act. Nevertheless, the Archivist and records personnel in the NSC have a duty to adopt guidelines ensuring that records under the Federal Records Act are preserved. The Court observes that since other components

of the EOP have already adopted new guidelines, this will not impose any undue burden. Accordingly, the Archivist is hereby directed forthwith to perform her obligations under the Federal Records Act with respect to the NSC's records. The Court shall issue an Order of even date herewith in accordance with this Memorandum Opinion.

### ORDER

Upon careful consideration of the parties' submissions, the arguments of Counsel, the record in the case and the underlying law, and for the reasons articulated in the Opinion of the Court of even date herewith, it is, by the Court, this 14th day of February 1995,

ORDERED that the parties' Motion to exceed page limitations shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED that Defendants' Motion to withdraw and amend prior responses to Requests for Admissions shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED that Defendants' Motion for Summary Judgment shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the Court hereby declares that to the extent the NSC's current recordkeeping guidelines classify all of its records as "Presidential," those guidelines are contrary to law and the Archivist is hereby directed to perform her obligations under the Federal Records Act; and it is

FURTHER ORDERED that the Court hereby declares that the NSC is an agency subject to the FOIA, within the meaning of the Federal Records Act, with the limited exception mentioned in the Court's Opinion of even date herewith, and the records created and received on the NSC's electronic communications systems shall be maintained and preserved in accordance with the Federal Records Act; and it is

FURTHER ORDERED that on or before 4:00 p.m. on February 27, 1995, the Executive Office of the President and the Archivist shall forthwith adopt new guidelines for the National Security Council, in place of those vacated and nullified on March 25, 1994, in accordance with the Court's Opinion issued on even date herewith.

### EXHIBIT A

### THE WHITE HOUSE

### WASHINGTON

March 24, 1994

MEMORANDUM FOR ANTHONY LAKE

WILLIAM H. ITOH

SUBJECT: Access to NSC Records

I understand that the status of the National Security Council (NSC) under the Freedom of Information Act (FOIA) and the Presidential Records Act will be the subject of further litigation in the case of *Armstrong v. Executive Office of the President*. I further understand our position is that the NSC is an entity within the Executive Office of the President that exists solely to advise and assist me in the discharge of my constitutionally based responsibilities over the national security affairs of the United States. If this legal position prevails, I understand that one consequence is that NSC records would not, as a matter of law, be subject to disclosure under the Freedom of Information Act.

Notwithstanding this legal conclusion, I strongly support the policy of past Administrations of permitting public access to certain NSC records, and of leaving certain NSC records to the incoming Administration in order to ensure a smooth transition on national security matters. Therefore, to provide for continued access to NSC records and their appropriate disposition at the end of my Administration, I direct you to take the following steps:

1. Establish procedures for continued access by the public to those NSC records previously transferred by one Administration to another for transition and continuity purposes.

2. Establish procedures for access by the public to appropriate NSC records of the current Administration.

3. Develop a plan to provide copies of appropriate NSC records to the next Administration in order to provide for smooth transition and continuity of essential foreign policy and national security matters.

(s) William J. Clinton

## EXHIBIT B

### NATIONAL SECURITY COUNCIL

### WASHINGTON, DC 20506

March 25, 1994

*ACTION*

MEMORANDUM FOR WILLIAM H. LEARY

FROM: WILLIAM H. ITOH

SUBJECT: Instruction on Presidential Status of the National Security Council and Revised Disclosure and Disposition Policy

A. *Summary*

The purpose of this memo is to direct you to revoke the National Security Council's existing FOIA guidelines, 32 C.F.R. § 2101 and simultaneously to issue voluntary disclosure guidelines consistent with President Clinton's memorandum to me and Tony Lake, dated March 24, 1994. The President's memorandum sets forth his instruction to provide for continued public access to NSC records that were left at the NSC by prior Administrations, to provide for public access to appropriate records of this NSC, and to transfer copies of appropriate NSC records to the next Administration.

This memo reflects that the NSC is an entity within the Executive Office of the President that solely advises and assists the President and therefore is not subject as a matter of law to the FOIA. However, the NSC's new voluntary disclosure policy is to provide that the NSC will continue to process pending FOIA requests, including during the pendency of the *Armstrong v. EOP* litigation, and will receive and process future document requests.

B. *Prior NSC FOIA and Recordkeeping Practices*

Since its inception, each administration has left behind certain records for the purpose of promoting continuity in national security matters. In recent years, such records have been filed and maintained separately. Previously, they were referred to as "institutional" records and, over time, they came to be searched in response to FOIA requests. In addition, such records have been disposed of according to the Federal Records Act, 44 U.S.C. § 3301.

Most NSC records have not been searched by NSC in response to FOIA requests. These Presidential records have been transferred to the Presidential Library of the respective President upon completion of his term in office. Under the Presidential Records Act ("PRA"), which went into effect on January 20, 1981, Presidential records are ultimately subject to the FOIA, though not until at least five years after the end of an administration. On February 19, 1975, the National Security Council ("NSC") issued regulations intended to guide NSC staff in response to requests for classified material under the amended Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to the extent that Act is applicable to the National Security Council. *See* 32 C.F.R. § 2101.1; 40 Fed. Reg. 7316 (February 19, 1975). Since that time, the NSC has responded to FOIA requests for those institutional records mentioned above, although the specific question of its legal obligation to do so has not been ultimately resolved.

C. *Armstrong v. EOP Litigation*

In the pending *Armstrong v. EOP* litigation, NSC's record-keeping and FOIA practices of treating distinct categories of records have been challenged. On August 13, 1993, the Court of Appeals for the District of Columbia Circuit issued a decision which held in part that NSC's recordkeeping guidelines defining what are Presidential records are subject to judicial review. *Armstrong v. EOP*, 1 F.3d 1274, 1290 (D.C.Cir.1993). The court of appeals ordered that the case be remanded to the district court for further proceedings "to determine whether NSC's guidelines inap-

propriately classify as presidential records materials that would otherwise be subject to the FOIA." *Id.* at 1296.

In reaching its decision, the court of appeals noted that the definition of a Presidential record in the PRA specifically excludes any documentary materials of an "agency" as that term is defined under the FOIA. 44 U.S.C. 2201(2)(B)(i). *Armstrong v. EOP*, 1 F.3d 1274, 1290. Accordingly, the court found that the Presidential Records Act would apply only to records that fall outside the scope of the FOIA because they are not agency records. *Id.* at 1292.

In analyzing whether the definition of a Presidential record intrudes upon the definition of an agency record subject to the FOIA, the court said that the inquiry is whether the entity at issue which maintains the records is an "agency" whose records are subject to the FOIA. *Armstrong v. EOP*, 1 F.3d at 1294. Relying on Supreme Court and D.C. Circuit case law, the court noted that "only entities 'whose sole function is to advise and assist the President' are not separate agencies subject to the FOIA." *Id.* at 1295.

### D. *NSC Status as a Presidential Entity*

The NSC was created by Congress in the National Security Act of 1947, 50 U.S.C. 402. By statute, the National Security Council includes the President, the Vice President, and the Secretaries of State and Defense. *Id.* Other high-ranking officials may be designated by the President as Council members, or to attend Council meetings. The 1947 Act sets forth the NSC's statutory functions. Subsection (a) of the Act provides, in part that the "function of the Council shall be to advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security so as to enable the military services and the other departments and agencies of the Government to cooperate more effectively in matters involving national security." 50 U.S.C. § 402(a).

The 1947 Act also provides for the creation of a staff to support the NSC. The NSC staff advises and assists the President, under the direction of the Assistant to the President for National Security Affairs ("APNSA") and the Deputy Assistant to the President for National Security Affairs ("DAPNSA").

Taking into account the historical and current functions and purposes of the NSC, the NSC is an entity within the Executive Office of the President that exists solely to advise and assist the President in the discharge of his constitutionally based responsibilities over the national security affairs of the United States. As a matter of law, therefore, the NSC is not an "agency" as that term has been defined and construed under the Freedom of Information Act. Therefore, the NSC's disclosure policies and practices should reflect that the NSC shall maintain its records in accordance with the Presidential Records Act, and the NSC's existing FOIA guidelines should be revoked.

### E. *New Disclosure and Disposition Policy*

On March 24, 1994, President Clinton sent a memorandum to me and Tony Lake directing us to provide for continued public access to those NSC records that have previously been left to an incoming administration to promote continuity in national security matters. Pursuant to this Presidential memorandum, the NSC shall establish a disclosure policy under which procedures will be developed to make these records available on a discretionary basis. These records, which previously would have been searched by NSC in response to FOIA requests, shall continue to be searched and, subject to the exemptions from disclosure set forth in the FOIA, made available to requesters on a discretionary basis—notwithstanding the NSC's status as a Presidential entity within the EOP.

In addition, the President's memorandum directed the NSC to provide for the release of appropriate NSC records of the current Administration. Therefore, the NSC will continue to respond to document requests regarding appropriate Clinton administration records, subject to the exemptions from disclosure set forth in the FOIA. A statement of the NSC's new disclosure policy and procedures should be prepared for my signature and subsequent publication in the *Federal Register*.

Finally, the President's memorandum directed the NSC to transfer to the next Administration copies of appropriate NSC records in order to provide for a smooth transition and continuity of important foreign policy and national security matters. Accordingly, you should develop a plan to provide for identifying and transferring copies of such records.

NATIONAL SECURITY COUNCIL

WASHINGTON, D.C. 20506

May 8, 1993

MEMORANDUM FOR NATIONAL SECURITY COUNCIL STAFF
FROM: WILLIAM H. ITOH
ALAN J. KRECZKO
SUBJECT: Recordkeeping Guidance

Pursuant to the Presidential Records Act, the Federal Records Act, and pending court orders, all staff within the Executive Office of the President are obligated to create, maintain, and preserve records of their activities. The attached memoranda reflect the general guidance being provided to all EOP staff. All NSC staff should review carefully and comply with the guidance in these memoranda.

Because the NSC both advises and assists the President and is an agency, the issue of which NSC records are presidential and which are federal is an important one. The Office of the Legal Adviser and the Information Management staff will be providing shortly additional training to assist all NSC staff in implementing the attached guidance.
Attachments
Tab A Memorandum on Federal Records
Tab B Memorandum on Presidential Records

NATIONAL SECURITY COUNCIL

WASHINGTON, D.C. 20506

MEMORANDUM FOR ALL NATIONAL SECURITY COUNCIL STAFF
FROM: WILLIAM ITOH

ALAN KRECZKO
SUBJECT: Federal Records

*INTRODUCTION*

The offices within the Executive Office of the President generate two categories of records: "Presidential Records" and "Federal Records."

Records are "Presidential" if they are "created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory or other official or ceremonial duties of the President." Such Presidential records are subject to the provisions of the Presidential Records Act, 44 U.S.C. § 2201. Presidential records remain in the custody and control of the President during his term of office and are not accessible to the public until five years after the end of the Administration, at the earliest. The treatment of Presidential records will be addressed in a separate memorandum.

It is the purpose of this memorandum to discuss the identification, maintenance and disposition of "federal" records. Materials are "federal records" if (1) the materials have been created or received by agency personnel in connection with their official duties in a federal agency, and (2) the materials are appropriate for preservation as evidence of the agency's activities or because they contain information of value. Federal records are subject to the provisions of the Federal Records Act, 44 U.S.C. Chapters 29, 31 and 33. Unlike Presidential records, federal records are accessible to the public during the Administration's term, unless exempt from disclosure under the provisions of the Freedom of Information Act.[1]

---

1. All records of the White House Office, the Office of Policy Development, the National Economic Council, the Council of Economic Advisers, the President's Intelligence Oversight Board and the President's Foreign Intelligence Advisory Board are Presidential records.

The records of the Office of the Vice President are treated in the same manner as Presidential records under the Presidential Records Act. The records of the Office of the Vice President are not federal records.

The Federal Records Act imposes certain legal obligations with respect to the creation and receipt, custody and maintenance, and disposition of federal records. The responsibilities apply regardless of whether the records are generated in paper form or by automated systems.

It is critical that staff members in offices, such as the National Security Council, that create or receive both federal and Presidential records, file those records *separately* in clearly designated files. Documents subject to the Federal Records Act may be subject to public disclosure under the Freedom of Information Act. Presidential records, by contrast, are not subject to the Federal Records Act and are not subject to the provisions of the Freedom of Information Act during the President's term of office. Personal records (defined and discussed below) also should be segregated, and filed separately, from official records.

The guidance that follows will assist EOP staff in complying with the Federal Records Act, which is designed to ensure that documentation of official activities is adequately created and preserved. *See* 44 U.S.C. § 3101. As explained below, not every document that you create or receive will be subject to the Federal Records Act, and it is therefore important to review this guidance to understand when federal records act obligations do apply. In preparing this guidance, we have consulted with officials of the National Archives and Records Administration.

## DEFINITION OF FEDERAL RECORDS

The Federal Records Act defines federal records as:

> [A]ll books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States under Federal law or in connection with the transaction of public business and preserved or appropriate for preservations by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them.
>
> —44 U.S.C. § 3301.

Under this definition, federal records are documentary materials that meet two tests. *First,* the materials must have been *created* or *received* by agency personnel in connection with their official duties in a federal agency. *Second,* the materials must be appropriate for preservation as evidence of the agency's activities or because they contain information of value. Federal records may be in any physical form, including paper, film and disk. The method used to record information may be manual, mechanical, photographic, electronic, or any combination of these or other technologies.

A document created in any agency normally becomes a federal record once it is circulated to others in the course of conducting agency business, or once it is placed in files accessible to others. Moreover, even documents that are not circulated can become federal records if, in the judgment of the agency, those documents are needed to conduct agency business—and whether or not those documents are accommodated by current filing systems employed by the agency.

Materials *received* by agency personnel are federal records when they are received in the

> Records of the National Security Council staff are Presidential Records if they were received or created by or for the President, the Assistant to the President for National Security Affairs, the Deputy Assistant to the President for National Security Affairs, the White House office, or a unit or an individual within the NSC in advising or assisting the President, and are not official records of the NSC.
>
> Records produced or received by the Director of the Office of Science and Technology Policy in

> his role as Science Advisor to the President are Presidential records and should be segregated as such. Other records of the OSTP are federal records.
>
> Records of the Office of Management and Budget, the Office of the United States Trade Representative, the Council on Environmental Quality, and the Office of Administration are federal, not Presidential records.

course of official business. Materials received can become federal records whether they have been transmitted in person, by messenger, by mail, by electronic communication, or by any other means.

At the same time, certain types of documentary materials are *not* subject to the Federal Records Act. The Act specifically excludes (1) library and museum materials created, or acquired and preserved, solely for reference or exhibit purposes; (2) extra copies of documents kept only for convenience of reference; and (3) stocks of publications and processed documents. These and other types of transitory or duplicate records are considered "nonrecord" because they are not "appropriate for preservation" as defined in the Act. Such materials are not needed to provide full and accurate documentation of an agency's policies, decisions, procedures, and program activities. These materials need not be maintained in official files, and, unlike federal records, may be destroyed when no longer needed and without prior approval of the National Archives and Records Administration.

Other examples of "nonrecord" materials not covered by the Federal Records Act may include:

—Preliminary drafts, that are not circulated to any other individual, of correspondence, reports, and studies.

—Preliminary drafts, work sheets and informal notes that contain information reflected in final documents and that do not document policy development or execution.

—Tickler, follow-up or suspense copies of correspondence, provided there are copies of documents in the official files.

—Newspaper clippings or news summaries, particularly if they are not annotated.

—Copies of printed or processed agency materials, such as operating and procedural manuals, directives, and notices, distributed for the information or use of agency employees.

—Shorthand and other notes that have been transcribed or converted to formal documents that have been verified for accuracy and completeness.

—Catalogs, trade journals, and other publications that are received from other government agencies, commercial firms, or private institutions and that are maintained for reference purposes.

In addition, certain "personal papers" fall outside the scope of the Federal Records Act. Personal papers are documentary materials that are not used in the transaction of agency business. Examples include:

—Papers and other materials accumulated by a staff member before joining government service.

—Materials that relate to a staff member's private affairs, such as personal financial records, insurance forms, and materials relating to an individual's professional activities and outside business and political pursuits.

—Personal photographs.

—Materials that may refer to official duties but are not directly used to carry out those duties. These include diaries, personal calendars, journals, and notes intended for an individual's personal use (memory aids and personal observations on work-related matters).[2]

It is important to remember, however, that certain informal documents may be federal records. In the Executive Office of the President, to a greater extent than in many other government offices, drafts, notes, background materials or working papers can be considered federal records because they document policy development, significant decisions, major activities, or other matters basic to an understanding of the office and its role in government operations. Such records should be treated as federal records and maintained in official files if they were circulated for review or clearance, and if they have been modified substantively.

When it is difficult to determine whether documents or other records should be treated as federal records, you *should* tentatively

---

**2.** For further information on personal papers, consult *Personal Papers of Executive Branch Officials: A Management Guide,* published by the National Archives and Records Administration. Copies are available in the EOP Office of Administration.

treat them as federal records and contact the appropriate EOP agency records management office for a final determination. Legal questions will be referred by the records management office to appropriate counsel.

## RECORDS CREATION AND MAINTENANCE REQUIREMENTS

When acting in their capacity as employees of a federal agency, such agency employees are responsible for complying with the Federal Records Act and related regulations.

The law requires that adequate and proper records be created and preserved to document the organization, functions, policies, decisions, procedures and essential transactions of the agency. The law also specifically requires that records be kept for appropriate periods if they can be used to protect the legal and financial rights of the Government or individuals directly affected by the agency's activities.

In order to ensure that agency records contain an adequate and proper account of policy development, implementation and decision-making, each employee must document those discussions, meetings and telephone conversations that are necessary to understand these functions. Where appropriate, in formal settings, minutes or notes should be taken for the purpose of including them in official files.

All staff members are responsible for complying with procedures that result in adequate and proper records creation and maintenance. All materials meeting federal records criteria must be incorporated into appropriate agency files or records systems. EOP staff members should consult with the appropriate EOP agency records management office to address any questions concerning the creation and maintenance of federal records.

## ELECTRONIC FEDERAL RECORDS

Increasingly, federal records may be created electronically. Records may be generated on word processing, or electronic mail ("e-mail"), systems, or other computer applications.

Records generated electronically must be incorporated into an official recordkeeping system. Thus, no word processing or e-mail document that is a federal record should be deleted unless it has been (a) printed and placed in an appropriate file, or (b) preserved in an appropriate electronic system.

On January 6 and 11, 1993, in the case of *Armstrong v. Executive Office of the President,* United States District Judge Charles R. Richey directed the National Archives and Records Administration to work with components of the EOP to develop further recordkeeping guidance both for e-mail communications in the EOP and for disposition of EOP electronic federal records generally. Pursuant to these orders, and until further instructions from the Counsel's office, the following special rules should be observed by components of the EOP that generate federal records:

1. Material may not be deleted from any e-mail file unless (a) the material has been retained in full on a back-up tape or other comparable medium, and (b) the retained version includes both full text and all available transmittal information; and

2. EOP staff members with records management responsibility must monitor the implementation of guidance on federal records (including the status of records) to ensure consistent application of the court's order.

Questions concerning the status of electronic records, or the application of these rules to particular computer systems, should be directed to the appropriate EOP agency records management office. That office will periodically monitor electronic records systems to ensure that correct records status determinations have been made.

## DESTRUCTION OR REMOVAL OF FEDERAL RECORDS

Federal records, as defined by the Federal Records Act, may not be destroyed, or permanently removed from appropriate official files, without the prior approval of the National Archives and Records Administration.

Federal records should be maintained in organized files and may not be damaged or altered by any staff member, except where

required by statute or regulation. Nor may federal records be temporarily removed from official files except for official purposes, and only if returned to the official files upon completion of that official function.

Policies and procedures governing the disposition of federal records are prescribed by the National Archives and Records Administration and are incorporated into the EOP records management program. Further information concerning these policies and procedures should be obtained from the appropriate EOP records management office.

*REMOVAL OF NONRECORD AND PERSONAL MATERIALS*

Purely personal, unclassified materials may be removed from the office by staff members at any time, subject to any agency procedures regulating such removal.

Unclassified nonrecord materials, with the exception of copies of records, may be removed with the prior approval of the agency official with records management responsibility.

Except where expressly authorized by appropriate agency officials, copies of federal records, regardless of the reason for which they have been duplicated, may not be taken by staff members for any purpose other than an official purpose related to the staff members' official duties and responsibilities.

No classified materials may be removed from the office at any time, without compliance with the rules applicable to such materials.

*TRAINING*

EOP agency records management offices and other appropriate personnel will be providing records management training for all employees who generate or receive federal records.

### EXHIBIT C

U.S. Department of Justice
Civil Division

*Washington, D.C. 20530*

Telephone:

(202) 514–4336

July 15, 1994

*BY MESSENGER*

Michael E. Tankersley, Esq.
Public Citizen Litigation Group
Suite 700
2000 P Street, N.W.
Washington, D.C. 20036

Re: *Armstrong v. Executive
Office of the President*

Dear Michael:

Enclosed please find recordkeeping guidance issued on July 14, 1994, by the Office of Administration (OA), the Office of the U.S. Trade Representative (USTR), the Office of Science and Technology Policy (OSTP), as well as cover transmittals based on OA's Directive from the Office of Management and Budget (OMB), the Office of National Drug Control Policy (ONDCP), and the Council on Environmental Quality (CEQ) (*see* Tabs A–F).

With respect to designations of "high-level officials" for purpose of electronic calendar recordkeeping requirements pursuant to the above guidance, I can confirm that OA, USTR, OSTP, OMB, and CEQ have designated their "high-level officials" in accordance with the listing produced by defendants in the attachment to our settlement correspondence of March 24, 1994. A complete listing of "high-level officials" for the purpose described above is attached at Tab G. ONDCP also confirms their prior designations, as modified due to changes in their organization subsequent to the March 24 correspondence. *See id.*

Sincerely yours,
(s) Jason R. Baron
Jason R. Baron
Trial Attorney
Federal Programs Branch
Civil Division

EXECUTIVE OFFICE
OF THE PRESIDENT
OFFICE OF ADMINISTRATION

Washington, D.C. 20503

July 14, 1994

MEMORANDUM FOR OASIS ALL–IN–1 USERS WITH FEDERAL RECORD RESPONSIBILITIES

FROM: PATSY L. THOMASSON

DIRECTOR

OFFICE OF ADMINISTRATION

SUBJECT: *DIRECTIVE ON RECORDS MANAGEMENT OF ELECTRONIC COMMUNICATIONS*

The attached directive is a very important document that describes what each OASIS ALL–IN–1 user must do to ensure that records of our business processes are made. This directive applies to all EOP agencies with Federal records responsibilities that use OA's electronic communication system. Officials of subscriber agencies have concurred in the contents of this directive.

This directive is being distributed in several ways. First, each OASIS subscriber with Federal records responsibilities will receive an electronic version. New users will receive a copy when their account is activated. A permanent copy of the latest directive will be stored on the Bulletin Board of OASIS for easy reference for all users. Also, a supply of paper copies will be distributed to administrative contacts within the next two weeks for reference copies in the administrative offices. Finally, additional copies may be obtained from the Office of General Counsel by calling extension 52273.

If you should have questions about the material contained within this directive, you should first contact your agency records liaison staff. If questions still remain, please contact the OA Records Management Office at extension 56471.

OFFICE OF ADMINISTRATION DIRECTIVE

SUBJECT: The OASIS ALL–IN–1 Electronic Communication System and Federal Records Procedures

Introduction

1. Purpose. To establish records management objectives and responsibilities for the creation, maintenance, use, and disposition of Federal records on the OASIS ALL–IN–1 system.

2. Personnel Concerned. All OASIS ALL–IN–1 users with Federal records responsibilities.

3. Directive or Bulletin Cancelled. None; paragraph 7.b of Directive LISD.04–0, "Records Management Program," is replaced by this Directive.

4. Authority. 44 U.S.C. Chapters 21, 29, 31, and 33; 36 CFR Parts 1220, 1222, 1228, and 1234.

5. Originator. Information Management Division

6. Review. Annually; whenever substantive modifications to the OASIS ALL–IN–1 system are contemplated; before any new electronic mail systems are implemented by EOP agency users; and any new electronic records management systems are implemented.

The following directive is hereby issued.

Patsy L. Thomasson

Patsy L. Thomasson

Director of the Office of Administration

7/13/94

Date

## TABLE OF CONTENTS

OVERVIEW .................................................... 717
 1. Purpose ................................................ 717
 2. Definitions ............................................ 717
THE ELECTRONIC MESSAGING (E–MAIL) SYSTEM ................... 719
 3. Policy ................................................ 719
 4. Identifying E–Mail Communications That Are Federal Records ..... 719
 Examples of e-mail communications that are Federal records 720
 Examples of nonrecord messages on e-mail ................. 721
OASIS ALL–IN–1 FEATURES ......................................... 721
 5. E-mail Messages ..................................... 721

6. Calendars ......................................................... 722
7. Personnel Directories ......................................... 723
8. Desk Management ............................................... 723
9. Telephone Messaging, Paging and WAVES Appointments ........... 723
10. Information Management ....................................... 723
11. The Bulletin Board .......................................... 723
 The Suggestion Box .......................................... 723
12. Interactive Training ........................................ 723
13. User Set–Up Functions ....................................... 723
14. System Backup Tapes ......................................... 724
MONITORING RECORDS DISPOSITION ................................. 724
RESPONSIBILITIES .............................................. 724
APPENDIX 1—TEMPORARY RECORDS ON ELECTRONIC COMMUNICATIONS SYSTEMS

OVERVIEW

1. *Purpose.*

To establish policy, responsibilities, guidelines, requirements, and procedures for the preservation of Federal records created and transmitted on the OASIS ALL–IN–1 system among the agencies of the Executive Office of the President.

This directive supersedes previous records management instructions on Federal records on electronic mail (e-mail) systems.

2. *Definitions.*

Basic records management terms are defined in OA Directive LRS.04–0 (44 U.S.C. 3301). The definitions listed below are specific to the purpose of this directive.

 a. **Electronic Mail.** A document created or received on an e-mail system including brief notes, more formal or substantive narrative documents, and any attachments, such as word processing documents, which may be transmitted with the message. (NARA definition)

 b. **Electronic Records.** This term includes numeric, graphic, and text information, which may be recorded on any medium capable of being read by a computer and which satisfies the definition of a Federal record in 44 U.S.C. 3301. This includes, but is not limited to, magnetic media, such as tapes and disks, and optical disks. (36 CFR 1234.1)

 c. **Recordkeeping System.** A system for collecting, organizing, and storing records in order to facilitate their preservation, retrieval, use, and disposition and to fulfill recordkeeping requirements. (NARA definition)

 d. **Electronic Mail System.** As used in this directive, the application available on OASIS ALL–IN–1 that is used to create, receive and transmit messages and other documents or create calendars that can be used by multiple staff members. Excluded from this definition are file transfer utilities (software that transmits files between users but does not retain any transmission data), data systems used to collect and process data that have been organized into data files or data bases on either personal computers or mainframe computers, and word processing documents not transmitted on an e-mail system.

 e. **Federal Records.** As defined in the law (44 U.S.C. 3301), Federal records are:

[A]ll books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them.

The phrase "regardless of physical form or characteristics" means that the records

may be paper, film, disk, or any other physical type or form; and that the method used to record information may be manual, mechanical, photographic, electronic, or any combination of these or other technologies.

Documentary materials are Federal records when they meet both of the following conditions:

(1) They are made or received by an agency of the United States Government under Federal law or in connection with the transaction of agency business; and

(2) They are preserved or are appropriate for preservation as evidence of agency organization and activities or because of the value of the information they contain. (36 CFR 1222.34)

In this context, the term "preserved" means the record is deliberately filed, stored, or otherwise systematically maintained for future use, including being stored in electronic files, folders, or logs.

The phrase "appropriate for preservation" means documentary materials made or received which in the judgment of the agency should be filed, stored, or otherwise systematically maintained by the agency because of the evidence of agency activities or information they contain, even though the materials may not by covered by its current filing or maintenance procedures. (36 CFR 1222.12)

f. **Temporary Record.** Any record which has been determined by the Archivist of the United States to have insufficient value (on basis of current standards) to warrant its preservation in the National Archives of the United States. This determination may take the form of:

(1) A series of records designated as disposable in an agency records disposition schedule approved by NARA (Standard Form 115, Request for Records Disposition Authority); or

(2) A series of records designated as disposable in a General Records Schedule. (36 CFR 1220.14)

Appendix 1 of this document contains a list of typical temporary Federal records.

g. **Permanent Record.** Any Federal record that has been determined by NARA to have sufficient value to warrant its preservation in the National Archives. (36 CFR 1220.14)

h. **Nonrecord Material.** U.S. Government-owned documentary materials, other than Presidential records, that do not meet the statutory definition of Federal records (44 U.S.C. 3301), or that have been excluded from coverage by the definition. Excluded materials are:

(1) Extra copies of documents preserved only for convenience of reference.

(2) Stocks of publications and of processed documents. However, each agency must create and maintain records sets of processed documents and publications, including annual and special reports, directives, special studies, brochures, pamphlets, books, handbooks, manuals, and posters.

(3) Library and museum materials made or acquired and preserved solely for reference or exhibition purposes.

i. **Records Management.** The planning, controlling, directing, organizing, training, promoting, and other managerial activities involved with respect to records creation, records maintenance and use, and records disposition in order to achieve adequate and proper documentation of the policies and transactions of the Federal Government and effective and economical management of agency operation. (36 CFR 1220.14)

j. **Records Schedule.** A document describing and providing instructions for the disposition of Federal records. It consists of one of the following:

(1) An SF 115, Request for Records Disposition Authority, that has been approved by NARA to authorize the disposition of Federal records;

(2) A General Records Schedule (GRS) issued by NARA; or

(3) A printed agency manual or directive containing the records descriptions

and disposition instructions approved by NARA on one or more SF–115s or issued by NARA in the GRS. (36 CFR 1220.14)

k. **General Records Schedules.** Schedules authorizing the disposal, after the lapse of specified periods of time, of records of a specified form or character common to several or all agencies if such records will not, at the end of the periods specified, have sufficient administrative, legal, research, or other value to warrant their further preservation by the United States Government. (44 U.S.C. 3303a(d))

l. **Transmission and Receipt Data.**

(1) Transmission Data. Information in e-mail systems regarding the identities of sender and addressee(s), date and time messages were sent.

(2) Receipt Data. Information in e-mail systems regarding date and time of receipt of a message, and/or acknowledgement of receipt or access by addressee(s).

m. **System Backups.** Copies of off-line media of software and data stored on direct access storage devices in a computer system to provide a means of re-creating a system and its data in the event of unintentional loss of data or software.

n. **Records Liaison.** Individual designated to oversee records management procedures for the agency.

o. **High-level officials.** Heads of independent agencies; their deputies and assistants; the heads of program offices and staff offices; staff assistants to those aforementioned officials, such as special assistants, confidential assistants, and administrative assistants; and career Federal employees, political appointees, and officers of the Armed Forces serving in equivalent or comparable positions. (GRS 23, item 5.a., as applied to positions within the EOP)

## THE ELECTRONIC MESSAGING (E-MAIL) SYSTEM

3. *Policy.*

The Office of Administration is developing a records management system which will support electronic storage, retrieval and disposition of OASIS ALL–IN–1 electronic messages that are determined to be Federal records. In addition it will segregate Presidential materials from Federal records. This system is currently being implemented in stages, the first of which is allowing a user to determine record status (i.e., record or non-record) of an e-mail message. Paragraph 5 below shows how this is being implemented. From time to time, new stages of the record-keeping system will be implemented at which time appropriate guidance will be provided to users.

In the interim, users should know that other materials created within OASIS ALL–IN–1 and/or sent to other ALL–IN–1 users will be automatically tagged as record material in both sending and receiving components. This means that users do not need to print materials *from OASIS only* unless either of the following conditions applies: the materials are Federal record calendars of high-level officials (see Paragraph 16 below); or it is required for other documentary purposes.

4. *Identifying E–Mail Communications That Are Federal Records.*

The features of OASIS ALL–IN–1 are discussed below. This discussion includes a description of the feature, user records management responsibilities and the proposed disposition of record material.

Users may create Federal records by using the following OASIS ALL–IN–1 features:

- E-mail messages (internal as well as external communications through FAX, X.400 and Internet), with or without word processing documents, spreadsheets or other attachments
- Executive word processing
- Calendar entries (meetings or appointments)
- Task entries
- Phone messages
- WAVES Appointments

- Pager Requests

The OASIS ALL–IN–1 e-mail application automatically saves all communications created by users in Presidential components (e.g., White House, Office of Policy Development and the Office of the Vice President). Materials created in Presidential components that are sent to Federal component(s) will be tagged and stored as Federal records when received by the Federal component(s).

In general, the above materials are Federal records when they meet two conditions. They are made or received by an agency of the United States Government under Federal law or in connection with the transaction of agency business; and they are preserved or are appropriate for preservation as evidence of agency organization and activities or because of the value of the information they contain. (36 CFR 1222.34; see also definition of Federal record)

When determining whether e-mail material is a record, keep in mind that multiple copies of messages or messages incorporated into other electronic messages may all be records if they are used for different purposes in the conduct of official business or filed in different files. More than one office may take action or otherwise use copies of a message. The copy would be a record in *each* of those offices, and would be subject to NARA–approved disposition schedules.

Examples of e-mail communications that are Federal records on the e-mail system are:

- Messages and any attachments containing information developed in preparing position papers, reports and studies;
- Messages and any attachments reflecting official actions taken in the course of conducting agency business;
- Messages and any attachments conveying information on programs, policies, decisions, and essential transactions;
- Messages and any attachments concerning statements of policy or the rationale for official decisions or actions;
- Messages and any attachments documenting oral exchanges, such as meetings or telephone conversations, during which policy was discussed or formulated or other agency activities were planned, discussed, or transacted;
- Messages and any attachments documenting the use of leave, agency procurement activities, personnel actions, or official agency financial actions.

Users should also be aware that preliminary drafts of final documents, rough notes and similar materials, as well as updates to drafts, notes or similar materials, must be maintained for purposes of adequate and proper documentation if

(1) they contain unique information, such as annotations or comments, that helps explain the formulation and execution of basic policies, decisions, actions or responsibilities; *and*

(2) they were circulated or made available to employees other than the creator for the purpose of approval, comment, action or to keep staff informed about agency business.

The above guidance about determining the record status of drafts transmitted via e-mail also applies to word processing documents shared on a network. Because drafts of such shared documents may be records, their record status must be reevaluated as changes are made. Substantive updates to such drafts that constitute records must be preserved by printing and filing with the final paper copy while minor changes do not need to be preserved. Such substantive updates should identify the author, recipient(s), and date of the draft, as well as similar data documenting substantive updates.

Users should also be aware that documents created in any word processing application that are transmitted through OASIS ALL–IN–1 may also be records. When an attached document is transmitted to any user, it is automatically captured by the electronic recordkeeping system and tagged as record or nonrecord according to the users' determination.

*Nonrecord e-mail communications.* Messages created on the e-mail system may contain information that either fails to meet the general conditions of record status or is covered by one of the three exemptions in the statutory definition of records.

Examples of nonrecord messages on e-mail typically include:

- Reminders of meeting and appointments that contain no information of value about such events;
- Telephone messages (unless the message contains information of value);
- Duplicate copies of records retained elsewhere in electronic format, if the copies are saved only for personal convenience of reference;
- Preliminary drafts of correspondence, reports or studies that were not circulated to any other individual;
- Preliminary drafts, work sheets and informal notes that contain the same information as in the final document provided that they do not contain substantive annotations or comments that add to a proper understanding the agency's formulation and execution of basic policies, decisions, actions or responsibilities. 36 CFR 1222.34;
- Personal notes that relate solely to an individual's personal and private affairs or are used exclusively for that individual's convenience;
- Invitations to unofficial social functions.

If users choose to retain nonrecord business material and personal material in the OASIS ALL–IN–1 system, they should not be commingled; that is, they must be filed in separate OASIS folders. Refer to the *OASIS Reference Manual,* refile document (rfd) command, for more information on how to transfer documents to separate folders.

For additional guidance on personal papers employees should refer to the NARA Guide on *Personal Papers of Executive Branch Officials.*

OASIS ALL–IN–1 FEATURES

5. *E-mail Messages*

Within the OASIS ALL–IN–1 system, E-mail messages are communications between a sender and some number of recipients, generally containing textual material and optionally containing attachments of word processing documents, spreadsheets or the like. They are created under the EM function within OASIS ALL–IN–1.

*Preserving e-mail messages electronically*

The actual e-mail screen includes an entry to tag the message and appears like the screen below:

Message Header

```
 Enter the name of one or more addressees:
TO:
TO:
TO:
TO:
TO:
TO:
 Enter the names of people to receive copies:
CC:
CC:
CC:
CC:
CC:
CC:
Record: Y [Y/N]
Subject:

Priority: FIRST_CLASS Delivery Receipt: NO Read Receipt: NO
Enter information and press ENTER, to GOLD–M for menu
```

In the Record field above, it will be necessary for the entry to be either Y or N before the user can continue with creating a message. If creating record material, the user may leave the entry as Y, the default value this field takes on when the screen first appears. If the message will be nonrecord, the user should enter N as the correct value in this field. Before preparing the message itself, the user may tab back to the field and change its value if necessary. Once a message is created, but before it is sent, the user may also modify this field through the use of the modify header (mh) command. See the *OASIS Reference Manual* or *OASIS Quick Reference Guide* for specifics of this command.

A similar process will occur when the user creates a response to a message. After issuing the send command, the question, "Is the document you are sending a Record? [Y/N]" will appear. As above, only one of the two responses will be accepted.

In either case, the message is kept electronically for later monitoring by the component's records liaison or records management staff. Thus, there is no requirement to print the message and any word processing attachments if it was designated as a record and prepared in either WordPerfect or the OASIS internal word processing application.

By way of a reminder, users may also request a read or a delivery receipt for the message by entering "YES" in the corresponding field(s) on the screen. Read receipts should be requested when it is necessary to confirm that an addressee has read a message by a certain time, such as when you assign tasks with a deadline or need concurrence by a definite time.

A special note: Users need to be aware of recordkeeping requirements for attachments that are not viewable within OASIS (e.g., spreadsheets, graphics, binary data, and the like); these attachments may be records and should be managed as part of the application under which they are viewed or processed.

If the user wishes to save messages for personal reference, the material contained in electronic personal folders is no longer treated as Federal records for future agency use. However, users are reminded that the contents of the folders (paper or electronic) may not be taken when terminating employment, unless approval is obtained according to agency procedures. Once approval is obtained, the materials will be reviewed by the records liaison to ensure that incorrectly designated nonrecord material is properly designated and filed and only approved materials are removed.

Indices to folders, such as the inbox and outbox, are dynamically changing lists and will be scheduled for disposition with NARA. Users do not need to take steps to save any index.

Users should be aware that drafts may be records on shared word processing systems as well as in e-mail. Record status should be evaluated in accordance with the definitions of records and preserved as follows:

- Print the document. If not included with the document, annotate it or attach a separate sheet that includes information on the author name, recipients, and date of creation or other such information documenting substantive updates.
- Forward the document to the appropriate individual for inclusion in the agency's system of official files.

6. *Calendars*

The ALL–IN–1 system offers a calendar option to users as part of the Desk Management function. The calendar function allows users to schedule meetings with other users, as well as to maintain their own record of meetings, events, and other appointments. Calendars may be displayed and printed by the day, week, or month. This function also provides users with the capability of maintaining a task or "to do" list. The following guidance on calendars applies only to the calendar option of the desk management function of the ALL–IN–1 system:

Calendars and task lists created using this system may be Federal records if they meet the criteria explained in paragraphs 2e and 4 of this directive.

Calendars and task lists that contain only personal business are personal records and

thus are not Federal records. Personal calendars do not need to be scheduled and may be updated, changed or deleted at the discretion of the individual user.

Calendars and task lists that contain information about government business are Federal records when they are circulated to or shared with others or are placed in files that allow others in the EOP to access and view the calendars in connection with official business.

Calendars may be shared with others for ease of communication. This is accomplished on the OASIS ALL–IN–1 system by using the Change Access Management command (cam) on the Time Management menu; refer to the *OASIS Reference Manual* for further details.

Shared calendar entries (including meeting and appointment notices and task list entries) are subject to sampling and monitoring.

Calendars that are Federal records shall be managed in the following ways:

a. Calendars, entries in calendars and associated data regarding authorized access may not be deleted or destroyed unless the calendar information has previously been saved by Systems Management staff or printed and filed as a record.

b. *Preserving Federal record calendar entries electronically*

Calendar entries are saved electronically when the calendar is shared with any other user. They will be disposed of after two years in accordance with GRS 23, item 5a.

c. *Preserving Federal record calendars of high-level officials*

Calendars and task lists relating to the schedule of high-level officials will be preserved by printing and filing according to the instructions in paragraph 16.a below. These calendars are saved permanently.

7. *Personnel Directories.* The user directory provides a short-cut for entering the recipient's name on the "TO" line of the message. In addition, users have access to an EOP Directory that contains names of indi-

viduals, their organization affiliation, room number, and telephone numbers. These directories will be subject to NARA-approved disposition schedules. There is also a separate feature that allows users to create their own personal address/telephone lists for ready reference and not for circulation. These personal directories are nonrecord.

8. *Desk Management* provides access to a calculator and displays the current time at locations throughout the world (World–Wide Time). This information is nonrecord reference material.

9. *Telephone messaging, paging and WAVES appointments* are available to users through the Desk Management menu. Telephone messages that contain substantive information on agency activities must be documented and incorporated into the agency's official files and, thereafter, can be deleted when they are no longer needed. Telephone messages that do not document agency activities or contain information of value need not be preserved. Paging requests and appointment requests are temporary and can be deleted when no longer needed.

10. *Information Management* displays commercial and other non-agency informational materials such as the news and weather. This information is nonrecord reference material.

11. The *Bulletin Board* broadcasts special announcements to OASIS users, such as a schedule of classroom training, blood donation drives, and health insurance open seasons. The *Suggestion Box* allows users to recommend changes that would better meet user needs. The Information Management Division of OA is responsible for preserving or disposing of materials placed on the Bulletin Board and the Suggestion Box in accordance with NARA-approved disposition schedules.

12. The interactive *training* routines available on the system are not Federal records.

13. The *User Set–Up* functions of the OASIS ALL–IN–1 system which include changes in passwords, work locations, work hours, and calendar and date formats, as well as the log-in/log-out data and lock keyboard

data, may be deleted under GRS 20, item 1(c).

14. *System backup tapes* can only be recycled with specific authorization from NARA. Any Federal records that remain on the OASIS ALL–IN–1 system, after the records and appropriate transmission data have been stored in official recordkeeping systems, are subject to NARA-approved disposition schedules.

## MONITORING RECORDS DISPOSITION

15. The purpose of monitoring is to identify systemic problems with record classification by users of the OASIS ALL–IN–1 system. Based on the review of samples, the monitor will assess the extent to which problems exist and may recommend modifications to remedial training courses or the issuance of notices to users that reinforce record classification principles such as those stated in this directive. Remedial steps would also include supplemental guidance and training which would be targeted to specific offices as necessary based on review of the samples.

For those OASIS features that are functioning under the electronic recordkeeping system, agencies will have the capability to electronically sample and review the records for conformance to this guidance; OA will assist agencies in using this feature. Other features may not be operating in an electronic mode and will require the agency to perform monitoring of paper samples until that feature's records are retained in electronic form.

New employees will receive records training as part of initial training required by the agency in order to use the OASIS system. In addition, employees will be notified during training that some of their electronic communications will be sampled for review on a periodic basis by records management personnel.

### Monitoring records in the electronic repository

Monitoring will occur on at least a monthly basis or more often if capacity on the online system will not accommodate a month's materials. The electronic repository of designated materials for the EOP component will be randomly sampled in a manner to ensure a high likelihood that a sample from every user is obtained for examination.

The monitor, usually the records liaison within the EOP component agency, will correct incorrectly designated materials in the sample and redeposit the corrected record into the repository. At this point in the process, the samples will not identify sender and recipient(s) names. However, this information will be available to the monitor if a nonrecord designation was corrected and the monitor must determine if specific users are consistently deficient in designating record status.

The monitor will maintain statistics on the number of entries changed during the examination and note patterns of errors with the objective of developing specific recommendations for training. The monitor will prepare an annual report to the agency head (or a designated agency official). The report will indicate the sample population count and how the sample was derived from the electronic repository, the number of entries incorrectly designated and corrections made. In addition, it shall include any recommendations for process improvements and suggested training refinements. The first report shall be submitted within three months after this directive is incorporated into other component's guidance.

The records liaison for each agency is also responsible for including in this report a statement regarding the printing and filing of the calendars of high-level officials. Reports shall be submitted to the agency head (or a designated agency official).

## RESPONSIBILITIES

16. Each EOP agency will:

a. Designate those agency personnel who are high-level officials for the purpose of recordkeeping obligations for OASIS calendars. Direct those designated high-level officials to ensure that OASIS ALL–IN–1 calendars relating to their activities are printed at the end of each month if they are Federal records as described in paragraph 6 above. The calendar should be annotated with the

list of individuals who had access to the calendar and sent to the agency records liaison for inclusion in the agency's official file system.

b. Ensure that each agency employee receives training in Federal record responsibilities.

c. Direct the head of each agency component (division directors or equivalent) to instruct all users of the OASIS ALL–IN–1 system with Federal records responsibilities to:

 (1) Follow procedures of this directive to determine when the e-mail message or FAX is a Federal record.

 (2) Be aware that all other electronic communications are automatically stored as record material until the record prompt can be integrated into ALL–IN–1 features.

 (3) Devise a plan to monitor the records as described in paragraph 15.

 (4) Notify their office records liaison when employees need further training to fulfill their Federal records responsibilities.

 (5) Conduct pre-departure interviews and review of electronic files with employees to assess whether they have properly preserved all Federal records for inclusion in official files.

17. The Information Management Division of OA will:

a. Back up the OASIS ALL–IN–1 system as necessary. Recycle such back-up tapes according to authorized disposition schedules.

b. Consult with agency records officers whenever substantive modifications to the electronic communications system are contemplated.

c. Provide guidance and training to educate OASIS ALL–IN–1 users on records management procedures.

d. Manage materials placed on the OASIS Bulletin Board and the Suggestion Box in accordance with NARA-approved disposition schedules.

## APPENDIX 1

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION
INFORMATION SYSTEMS AND TECHNOLOGY DIVISION
OFFICE OF RECORDS MANAGEMENT

*TEMPORARY RECORDS ON ELECTRONIC COMMUNICATION SYSTEMS*

Administrative Records: Messages and any attachments documenting agency administrative activities both internal and external. The agency program material may include documentation about the following administrative subjects:

1. Personnel: Official Personnel Folders (OPF), Service Record Cards, personnel correspondence, offers of employment, certificate of eligibles, Employee Record Cards, position classification, position descriptions, interview records, Performance Rating Review Board cases, temporary individual employee records in OPF, position identification strips, employee, departmental, and incentive awards, notifications of personnel actions, employment applications, operations statistical reports, operating correspondence and forms, supervisors' personnel files and duplicate OPF documentation, individual non-occupational health, Health Unit Employee Medical Folder (EMF), statistical summaries, employee performance, Financial Disclosure Reports, Equal Employment Opportunity, personnel counseling, Standards of Conduct, Labor Management Relations, training, administrative grievance, disciplinary and adverse action, personal injury, merit promotion, examining and certification, occupational injury and illness, denied health benefits claims, Federal Workplace drug testing program, donated leave, wage survey, and retirement assistance, security clearances.

2. Payrolling and Pay Administration: Time and attendance source and input, leave, taxes, Combined Federal Campaign and other allotment authorizations, Thrift Savings Plan, Direct Deposit Sign-up, levy and garnishment, payroll change and payroll correspondence, and retirement.

## OTHER TEMPORARY RECORDS

Records Common to Most Offices Within Agencies: These records include administrative subject files; facilitative records such as suspense files, tracking and control records, calendars, and indexes; and transitory documents; as well as certain types of records created in electronic form and stand-alone or networked micro- and mini-computers.

1. Office Administrative Files: Records accumulated by individual offices that relate to the internal administration or housekeeping activities of the office rather than the functions for which the office exists. In general, these records relate to the office organization, staffing, procedures, and communications; the expenditure of funds, including budget records; day-to-day administration of office personnel including training and travel; supplies and office services and equipment requests and receipts; and the use of office space and utilities. They may also include copies of internal activity and workload reports (including work progress, statistical, and narrative reports prepared in the office and forwarded to higher levels) and other materials that do not serve as unique documentation of the programs of the office. PERMANENT AGENCY RECORDS: Organizational charts, functional statements, and related records that document the essential organization, staffing, and procedures of the office.

2. Word Processing files. Documents such as letters, messages, memoranda, reports, handbooks, directives, and manuals recorded on electronic media such as hard disks or floppy diskettes.

3. Administrative Databases: Databases that support administrative or housekeeping functions, containing information derived from hard copy records.

4. Electronic Spreadsheets: Spreadsheets that are recorded on electronic media such as hard disks or floppy diskettes.

5. Schedules of Daily Activities: Calendars, appointments, schedules, logs, diaries, and other records documenting meetings, appointments, telephone calls, trips, visits, and other activities by Federal employees while serving in an official capacity, created and maintained in hard copy or electronic form, EXCLUDING materials determined to be personal.

6. Suspense Files: Documents arranged in chronological order as a reminder that an action is required on a given date or that a reply to action is expected and, if not received, should be traced on a given date.

## OTHER TEMPORARY RECORDS (CONTINUED)

7. Transitory Files: Documents of short-term interest which have no documentary or evidential value and normally not be kept more than 90 days. Examples of transitory correspondence are: Routine requests for information or publications and copies of replies which require no administrative action, no policy decision, and no special compilation or research for reply; originating office copies of letters of transmittal that do not add any information to that contained in the transmitted material, and receiving office copy if filed separately from transmitted material; quasi-official notices including memoranda and other records that do not serve as notices of holidays or charity and welfare fund appeals, bond campaigns, and similar records.

8. Tracking and Control Records: Longs, registers, and other records in hard copy of electronic form used to control or document the status of correspondence, reports, or other records.

9. Finding Aids (or Indexes): Indexes, lists, registers, and other finding aids in hard copy or electronic form used only to provide access to records, EXCLUDING records containing abstracts or other information that can be used as an information source apart from the related records.

EXECUTIVE OFFICE
OF THE PRESIDENT
OFFICE OF ADMINISTRATION

Washington, D.C. 20503

July 14, 1994

MEMORANDUM FOR INFORMATION SYSTEMS AND TECHNOLOGY MANAGERS
FROM: GWENDOLYN N. WEAVER

DEPUTY ASSISTANT DIRECTOR
INFORMATION MANAGEMENT DIVISION

SUBJECT: *Electronic Recordkeeping Application Requirements*

An electronic recordkeeping application must overcome the inherent deficiencies in the OASIS ALL–IN–1 e-mail system, an application designed to facilitate communications among users without retaining the materials for extended periods. This document outlines general system requirements for an electronic recordkeeping system and places responsibility on the various technical staffs within the division, in coordination with OA and DOJ legal counsels, to deliver products that meet these requirements. This document further serves as OA's commitment to provide the basic capabilities that capture the content of electronic mail communications within OASIS ALL–IN–1 and preserve and maintain the Federal record materials from OASIS ALL–IN–1 in the Automated Records Management System (ARMS) for official use.

Within OASIS ALL–IN–1, the following must occur:

1. Systems Management staff should ensure that E-mail communications screens (including e-mail, calendar entries, and other mail-enabled transactions) will be displayed such that the user will label the material with a record or nonrecord tag. The record status code may be set to a default value of "Y" or "YES" (indicating a record) to ease the data entry burden on users until the prompt is displayed on the screen for user entry.

2. Systems Management staff should ensure that each EOP agency's records will be identified by agency code to allow for searchability of record material by agency. It has been agreed among all EOP components that only Federal or only Presidential records will be created or stored by an agency in the OASIS ALL–IN–1 e-mail system. Systems management staff should also ensure that all materials created in Presidential components that have been sent to Federal components will be tagged and stored as Federal records.

3. The Systems Management staff should ensure that E-mail communications created in ALL–IN–1 are labelled with author, recipient(s), transmission data, available receipt data, subject, identity of the originating office and record status code. External e-mail communications will be retained with as much of this information as possible; however, the recipient should be able to tag the material as record or nonrecord after reading the communication.

4. On a periodic basis, Systems Management staff shall save all calendars designated as record calendars (i.e., shared with one or more users), inclusive of all record and nonrecord entries, covering the period from the last capture of calendar information. The data shall minimally include the information in the print/display calendar function as circulated within ALL–IN–1. The e-mail communications for the meeting entries within the calendar shall be managed separately as record/nonrecord entries as described in item 3 above.

5. Systems Management staff shall ensure that all electronic communications, including associated text and information described in item 3. above, shall be streamed into the ARMS as soon as reasonably possible after transmission from or entry into OASIS ALL–IN–1. Ideally this should take place in a realtime mode; or alternatively may occur overnight in a batch process.

6. Data Center Operations should ensure that janitor functions continue on the OASIS ALL–IN–1 accounts. This currently provides that messages from Inbox folders are transferred to a user's Wastebasket folder after 28 days in an unread status; that messages are transferred to Wastebasket from the Read, Created and Outbox folders after 14 days.

Materials should continue to be deleted from the Wastebasket on the following Saturday. No messages should be deleted from users' personal folders.

7. System administration staff should delete material (such as messages, documents, calendars, user set-up functions, distribution lists and the like) from the individual e-mail accounts of departed staff since all record/nonrecord communications and associated information have been captured by the ARMS system and its backup tapes and have been saved on the OASIS system backup tapes.

Records management staff have prepared a disposition plan to delete user indices of messages and distribution lists from ALL–IN–1 when no longer needed. To the extent that these materials are determined to be federal records, their deletion is authorized by the provisions of GRS 20, item 1c.

8. The Data Center Operations staff shall continue the current practice of preserving VAX and OASIS ALL–IN–1 backup tapes until final approval of their disposition is received from NARA.

Within the ARMS application, the following must be accomplished:

9. Systems Management staff should implement an automated monitoring process that allows only authorized records liaison staff from each agency to monitor a statistically valid sample of messages and change the record status tag on improperly designated materials. In the operational phase, after monitoring, Records Management staff should ensure that nonrecord material is deleted from the sample and record material is merged with previously saved record material that has been placed on a medium that facilitates later search and retrieval.

10. System Management staff should implement a search and retrieval ability to include keyword or text string searching on record material retained in ARMS. Only authorized staff may request searches on the following fields: author, originating agency, recipient, date/time of creation, record status code, subject and text (including attachments, if any).

11. System Management should develop a technical procedure that facilitates the Record Management staffs' review and disposition of the Federal records in the ARMS application according to the NARA-approved disposition schedule. Until such a procedure is developed all record material will be saved indefinitely.

12. System Management should develop a technical procedure that streams Federal record materials (including associated transmission and receipt data) onto tapes for delivery through the Records Management staff to NARA in a format conforming to 36 CFR 1228.188; and develop a similar technical procedure that streams Presidential materials (including associated transmission and receipt data) onto requested output media, in a format suitable to the White House Office of Records Management, for transfer to the appropriate Presidential library. To the extent required by law, materials shall be transferred under NARA-approved disposition schedules.

Questions on any of the above points should be addressed to me at extension 57323.

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE
EXECUTIVE OFFICE OF THE PRESIDENT

WASHINGTON

20506

July 14, 1994

*ACTION*

MEMORANDUM FOR USTR STAFF
FROM: THOMAS R. NIDES

SUBJECT: Electronic Communications Systems (Electronic Mail)

All USTR employees have ongoing responsibilities to create, maintain, and preserve records of their activities pursuant to the Federal Records Act (44 U.S.C., Chapters 29, 31, and 33). Traditionally, USTR has treated its records as federal and filed them in paper format.

This memorandum provides guidance for fulfilling USTR's legal obligations as they apply to federal records that are created on electronic communications systems. The guidance applies to the e-mail and calendar functions on the Local Area Network (LAN) (which includes WordPerfect Office e-mail) and the calendar function of WordPerfect Office, as well as subsequent revisions of WordPerfect Office software for e-mail, word processing, and calendar functions to be introduced in 1995.

The staff of USTR creates records electronically, including by the use of electronic communications systems. USTR has preserved electronic mail messages that are records by filing paper copies of these documents. We are proposing to begin July 14 to file e-mail electronically and transfer such e-mail to magnetic tape for long term preservation. USTR also preserves essential transmission data for these records electronically, including the name of the sender and each addressee, plus the date and exact time of transmission, which are recorded with the text of each message. "Read receipts" that identify when a message is "opened" by each addressee also are preserved whenever requested.

Successful implementation of this policy requires each USTR employee to do five things: (1) determine the record/nonrecord status of any e-mail message at the time of creation; (2) request read receipts whenever it is important to confirm the receipt of a message by a certain time; (3) for the time being, ensure that read receipts are preserved by electronically forwarding all receipts along with a copy of the federal records mail message to the federal records post office box; (4) print and file designated calendars and calendar authorization files monthly; and (5) print and file draft word processing documents that qualify as records.

*DETERMINING RECORD STATUS*

Electronic mail documents in USTR (like all other documentary materials) fall into one of two categories: records or nonrecord materials (which includes personal materials). The only records management judgment that USTR staff must make when using e-mail is to determine whether a message is record or nonrecord in nature.

The Federal Records Act defines federal records as:

> All books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States under federal law or be in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them. (44 U.S.C. 3301)

Under this definition, electronically recorded data that satisfy two tests are federal records. First, the data must have been created or received by agency personnel in connection with the transaction of public business. Second, they must be preserved or appropriate for preservation as evidence of the agency's activities or because they contain information of value. "Preserved" in the context of the USTR's e-mail systems means that the data are deliberately filed, stored, or otherwise systematically maintained for future use, including being stored in electronic files, folders, or logs.

Numeric, graphic, or text data that satisfy either of these two definitions are records, regardless of the medium on which they are recorded or the type of computer system on which the data are recorded or transmitted. Thus, electronic messages or documents that satisfy *the definition of federal records* are records. This includes:

—messages or documents containing information developed in preparing position papers, reports and studies;

—messages or documents reflecting official actions taken in the course of conducting USTR business;

—messages or documents conveying information on USTR programs, policies, decisions, and essential transactions;

—messages or documents that convey statements of policy or the rationale for official decisions or actions;

—messages or documents memorializing oral exchanges, such as meetings or telephone conversations, during which policy was discussed or formulated or other activities of the USTR were planned, discussed, or transacted.

Preliminary drafts of final documents, rough notes, and similar materials must be maintained for purposes of adequate and proper documentation if: (1) they contain unique information, such as annotations or comments, that help explain the formulation and execution of basic policies, decisions, actions, or responsibilities, *and* (2) they were circulated or made available to employees other than the creator for the purpose of approval, comment, action, or to keep staff informed about USTR business.

This guidance about determining the record status of preliminary drafts transmitted via e-mail also applies to word processing documents shared on a network. Because drafts of such shared documents may be records, their record status must be reevaluated as changes are made. Substantive updates to such drafts that constitute records must be preserved by printing and filing with the final paper copy while minor changes do not need to be preserved. Such substantive updates should identify the author, recipient(s), and date of the draft.

When the same information appears in two different documents, both documents may be records. Moreover, multiple copies of the same document may all be records if they are used for different purposes in the conduct of official business or filed in different files. More than one office may take action on, or

otherwise use, copies of a document, and in such cases each copy of the document is a record.

*Nonrecord or Personal Materials.*

Certain types of documentary materials created within USTR are considered "nonrecord" because they do not meet the conditions of record status as explained above or because they are excluded from the status of records by statute. This includes:

—reminders about meetings and appointments that contain no information of value about such events;

—telephone messages (unless the message contains information of value);

—invitations to unofficial social functions during office hours;

—preliminary drafts of correspondence, memoranda, reports, and studies that are not circulated to any other individual;

—preliminary drafts, work sheets, informal notes, and similar materials that contain the same information reflected in final documents and that do not document policy development or execution;

—notes about exclusively personal matters, such as private political or professional activities.

*Forwarding Federal Records Mail to the Federal Records Post Office Box*

To electronically send federal records e-mail to the records mail box, users should designate (R) as an e-mail addressee. To send nonrecord e-mail to the nonrecords mail box, users should designate (N) as an addressee. All mail messages that are sent on USTR's local area network must have either the (N) or (R) designation to comply with the *Armstrong v. EOP* Court Order and with the Federal Records Act (44 U.S.C., Chapters 29, 31, and 33).

*Monitoring Record Status Designations*

E-mail will be monitored and read in order to comply with the recent *Armstrong v. EOP* Court Order. To assist the USTR staff in making proper record status determinations, the staff of the Office of Computer Operations will periodically examine a sample of all

electronic mail messages and documents transmitted via e-mail, including those designated as nonrecord materials. The purpose of the examination is to identify any problems in interpreting this guidance for distinguishing between record and nonrecord materials. The selected messages and documents will be examined monthly in order to correct improper designations as promptly as possible.

Materials designated as nonrecord that are saved for the purpose of monitoring do not become federal records simply because they are retained for that purpose. However, if the Office of Computer Operations, in the course of the monitoring review, determines that the content of the materials show that the nonrecord designation of a particular message or document is incorrect, the staff shall redesignate it as a record. The staff of the Office of Computer Operations will report their findings to me at least once annually and recommend any needed changes in current guidance or procedures.

No copies of electronic mail documents (either electronic or paper) may be removed from USTR unless they are determined to be exclusively personal materials. If a departing staff member wishes to retain such documents, the staff of the Office of Computer Operations and the AUSTR for Administration must review the documents before authorizing their removal.

## PRESERVING ELECTRONIC MAIL MESSAGES

To facilitate the preservation of e-mail messages that are records, you are required to indicate whether the message is Record (R) or Nonrecord (N) each time you create a message. You should make that determination by following the guidelines in this memorandum for identifying records, nonrecord materials, and personal materials (a personal message should be labeled nonrecord (N)). WordPerfect Office mail users should make the same determination for any message broadcast on the Bulletin Board function. When in doubt, designate a message as a record (R).

When you designate a message as a record, a copy automatically will be routed to records management post office box on the Local Area Network (LAN) for incorporation into the appropriate records system. Also, any response to a record message *automatically* will be labeled a record.

## Transmission and Receipt Data

All electronic mail messages contain certain "transmission data" regarding the sender, addressee(s), and transmission (date and exact time) of a document. The transmission information associated with an electronic mail message that is designated a record also must be preserved as a record. Consequently, all e-mail messages routed to records management post office box as records will be filed electronically with the following transmission data included: the name of the sender and all recipients and the date and time of transmission.

Additionally, if you request a read receipt for an electronic mail record, the read receipt is also a record and must be preserved with the message. You should request read receipts whenever it is necessary to confirm that an addressee has read a message by a certain time, such as when you assign tasks with a deadline or need concurrence by a definite time. All users should forward the originating federal records e-mail message and the read receipt (as an attachment) to the federal records mail box by designating R as an e-mail addressee.

## PRESERVING CALENDARS

Calendars created on USTR's electronic mail systems that contain information about government business may also be records. Calendars and task lists that contain information about government business are federal records when they are circulated or shared with others or are placed in files that allow others in the EOP to access and view the calendars in connection with official business. Calendars that are not circulated to others, and are not made accessible to others, do not need to be preserved, and they may be updated, changed, or deleted at the individual's discretion. USTR manages calendars on these systems that are records as follows:

1. If electronic calendars relating to the activities of the USTR, Chief of Staff,

DUSTRs, AUSTRs, General Counsel, Deputy General Counsel, Chief Textile Negotiator, Counselor, and Special Counsel are shared with USTR employees, the shared calendars must be treated as records. They should be either printed out monthly and filed for permanent preservation or forwarded to the federal records post office box on the Local Area Network (LAN) as an attachment to a e-mail message. Entries in these calendars may *not* be deleted or destroyed prior to printing or forwarding to the records management post office box. When printing calendars for preservation, also print and file a list of the individuals who had authorized access to the calendar for the previous month. 2. Calendars of other employees that contain information about USTR activities will be retained on the computer system for two years. Entries in the calendars, and associated data regarding authorized access, may *not* be deleted or destroyed during those two years unless the calendar has been previously printed and forwarded to Records Management officials.

\* \* \* \* \* \*

This memorandum supersedes all previous guidance on electronic mail. I cannot emphasize too strongly the importance of staff compliance with this guidance in order to ensure that USTR fulfills its legal obligations regarding the creation and preservation of federal records. If you have any questions about this guidance, please contact Dr. Joan Steyaert, Office of Computer Operations (55140) or Ms. Laura Sherman, Office of General Counsel (53150).

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE EXECUTIVE OFFICE OF THE PRESIDENT

WASHINGTON

20506

July 14, 1994

*ACTION*

MEMORANDUM FOR JEFF VERBETEN

FROM: JOAN STEYAERT

SUBJECT: Electronic Mail Modifications

By July 1, 1994, you should begin to implement all procedures necessary to preserve all record e-mail messages on USTR's electronic mail systems (WordPerfect Office Mail) electronically. Since all record e-mail messages for the Clinton Administration have been retained, I assume that these procedures can be implemented promptly, with two exceptions. I understand that capturing read receipts electronically in association with the originating message and forcing the R/N designation for responses to nonrecord messages may require substantial additional reprogramming and that developing the search function in WordPerfect Office Mail may require work with the software vendor WordPerfect. Consequently, these two changes should be incorporated as part of the modified e-mail system that will be implemented in 1995.

All e-mail users will designate messages as records (R) or nonrecords (N). Messages designated as records will be routed electronically to the federal records post office. (WordPerfect is working on a revision of the current Office e-mail software to force R designation for e-mail messages that do not have a R/N designation.) Any such data determined to be federal records will be proposed for permanent retention by the National Archives. To preserve the record messages and related data electronically, we need to accomplish the following for WordPerfect Office e-mail:

1. Transmit the messages to separate on-line records management accounts (or post offices) for (1) all record messages and (2) all nonrecord messages. A statistical sample will be selected bi-weekly from each account for monitoring purposes. The nonrecord messages should be deleted as soon as Office of Computer Operations informs Administration that they have completed their examination and taken necessary corrective action.

2. Monitor online account in records management for a sample of all record and non-

record messages as instructed in my memo to Tom Nides. The sampled nonrecord messages should be deleted as soon as Office of Computer Operations informs you that they have completed their examination and verified the statistical sample.

3. Enable Records Management staff within Office of Computer Operations to designate the record messages as federal.

4. Retain EASY access to the sorted federal record messages in records and access management only. This access may be achieved by retaining the data online, or on easily useable optical disks, whichever is more practicable for you. In either case, it is my understanding that records and access management staff will be able to conduct keyword searches of all record messages. For federal records, this access must remain available until transferred to the National Archives.

5. Transfer to NARA a user listing of all unclassified and classified messages and a copy on magnetic tape of record messages and transmission data associated with each message.

6. Each record message must include the name of the sender and all addressees, the subject and the date and exact time of creation and transmission. Work with users to ensure that read receipts along with the original mail message are forwarded to the federal records post office box.

7. The Office of Computer Operations has drafted a records schedule that would authorize the deletion of user directories and logs (indices) of messages from the WordPerfect Office systems when no longer needed, and the deletion of distribution lists from WordPerfect Office when no longer needed. If this schedule is approved, it will no longer be necessary to preserve these materials.

8. When a departing staffer asks to remove electronic or paper copies of e-mail messages, they must first be reviewed by the records management staff to identify and file any "records" incorrectly designated nonrecord and to ensure that only personal materials are removed. The messages in the user's e-mail account should be deleted after the records management staff informs you that they have completed their review.

9. Before a key manager departs, lead clerical staff should check federal records files to determine whether calendars have been printed and appropriately filed for records retention purposes. If calendars have not been filed, the lead secretary should print a copy of the calendar and file it in the federal records files of that section for transfer to NARA. Once a copy has been retained the electronic data should be deleted.

10. For the cable traffic on USTR's Local Area Network (LAN), OCO staff have drafted a records schedule provision that would provide for the permanent retention (in printed format) of all cables directed to the attention of a specified USTR staffer. The draft schedule also would authorize the deletion "when no longer needed" of the remaining cable traffic in WordPerfect. The newswires on the LAN that are purchased from a commercial vendor constitute a nonrecord reference library, which should be deleted when no longer needed. Until NARA has approved our draft schedule, you should continue retaining a complete backup of all cable traffic on the LAN.

11. User Set–Up Functions, which include changes in passwords, work locations, work hours, lock keyboard data, calendar and date formats, and log-in/log-out data, should be deleted when no longer needed for system administration. To the extent that any such data are determined to be federal records, their deletion is authorized by the provisions of GRS 20, Item 1c.

OCO staff have drafted a records schedule for submission to the National Archives that would, for all data determined to be federal records, authorize the deletion of (1) copies of messages in individual e-mail accounts after one month or, in the case of data retained in personal folders, when the staffer departs the USTR; (2) user directories, distribution lists (for WordPerfect Office), and logs of messages; and (3) calendar data. However, until we have a final determination from NARA about the disposition of USTR federal records e-mail, you must continue the current practice of preserving backup tapes of the entire system.

If you have any questions, please let me know.

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE EXECUTIVE OFFICE OF THE PRESIDENT

WASHINGTON

20506

July 14, 1994

*ACTION*

MEMORANDUM FOR TOM NIDES
FROM: JOHN HOPKINS AND
JOAN STEYAERT
SUBJECT: Monitoring Electronic Mail

In order to identify and remedy any problems in USTR's staff's identification of e-mail records, USTR should institute the following plan for monitoring a sample of electronic mail messages and documents transmitted via e-mail.

1. The staff of Technical Services Group in the Office of Computer Operations (OCO) should examine a sample of e-mail accounts on a monthly basis following the issuance of written guidance to all staff. Improper designations of sampled materials will be corrected and deposited in the correct electronic file. Whenever OCO Administration, USTR detects a pattern of mistakes in interpreting the guidance, consultations with individual staff should be undertaken and modifications of the general guidance should be considered. Materials designated nonrecord that fit into the pattern of mistakes, but were not included in the monitoring sample, should be reviewed to correct improper designations before such materials are deleted.

2. The sampling should consist of a statistically valid random sample of record and nonrecord messages and documents. The sample should be designed to ensure a high probability of selecting record and nonrecord messages and documents of each user.

3. The monitoring system should retain the names of the creator and recipient(s) to enable redesignation of improper designa-

tions and retention of all transmission data for records, as well as consultations with individual staff as necessary.

4. The monitoring should include an annual report documenting the type of sampling conducted, number of materials reviewed, the number of materials incorrectly designated nonrecord and redesignated record, explanations of the incorrect designations, and interim modification(s) of the guidance. The report should include recommendations for modifications in guidance to staff or training. The report also should evaluate the adequacy of current schedule descriptions and retention periods for messages or other data on the e-mail systems, and recommend needed changes. The first of these reports should be submitted within three months after the issuance of written guidance to all staff.

5. When the staff of OCO Administration review materials that departing staff seek to remove from USTR, Technical Services Group should ensure that any records incorrectly designated nonrecord are redesignated and deposited in the correct electronic file.

EXECUTIVE OFFICE
OF THE PRESIDENT
OFFICE OF SCIENCE
AND TECHNOLOGY POLICY

WASHINGTON, D.C. 20500

July 14, 1994

MEMORANDUM FOR OSTP STAFF
FROM: BARBARA FERGUSON
SUBJECT: ELECTRONIC COMMUNICATIONS SYSTEMS (Electronic Mail)

All Office of Science and Technology Policy (OSTP) employees have ongoing responsibilities to create, maintain, and preserve records of their activities pursuant to the Federal Records Act (44 U.S.C., Chapters 29, 31, and 33). This memorandum provides guidance for fulfilling these obligations as they apply to records created on electronic communications systems.

The National Archives has defined electronic communications systems as electronic mail systems, electronic conferences, and

comparable systems with similar e-mail capabilities that retain transmission data. Within OSTP, this definition (and the guidance in this memorandum) applies to the e-mail function (CC:MAIL) and to the calendar function (ONTIME) of our LAN. The definitions apply as well to the All-in-One system operated by the Office of Administration (OA), and you are instructed to follow OA's guidance regarding that system. In addition, the definitions apply to the e-mail function of Internet (a system in which OSTP currently stores all incoming and outgoing messages).

The staff of OSTP create records electronically, including by the use of electronic communications systems. Records created by OSTP staff on e-mail will be treated as Federal records. OSTP preserves electronic mail messages that are records by filing them electronically and transferring them to magnetic tape in a software-independent format for long term preservation. OSTP also preserves essential transmission data for these records, including the name of the sender and each addressee, plus the date and exact time of transmission, which are recorded within the text of each message. "Read receipts" that identify when a message that is a record is "opened" by each addressee also are preserved whenever requested.

Successful implementation of this policy requires each OSTP employee to do three things: (1) determine the record/nonrecord status of any e-mail message at the time of creation and identify nonrecord messages by placing the word "nonrecord" in the message subject field; (2) request read receipts whenever it is important to confirm the receipt of a message by a certain time; and (3) print and file draft word processing documents that qualify as records. Calendars relating to the schedules of high-level officials must also be printed along with accompanying authorization files. All other tasks associated with the proper maintenance and disposition of e-mail records will be performed by OSTP's Records Management staff.

*Determining Record Status*

Electronic mail documents in OSTP fall into one of two categories: record or nonrecord material (which includes personal material). The only records management judgment that OSTP staff must make when using e-mail is to determine whether a message is record or nonrecord in nature.

Federal Records

The Federal Records Act defines federal records as:

All books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States under federal law or in connection with the transaction of public business and preserved or appropriate for preservation by the agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them. (44 U.S.C. 3301)

Numeric, graphic, or text information that meets this definition is record material, regardless of the medium on which it is recorded or the type of computer system on which the data are recorded or transmitted. E-mail messages (internal messages and external X.400 and Internet messages and any attachments transmitted through e-mail) and electronic documents are Federal records when they meet two conditions. They are made or received by an agency of the United States Government under Federal law or in connection with the transaction of agency business; and they are preserved or are appropriate for preservation as evidence of agency organization and activities or because of the value of the information they contain.

The term "preserved" means the record is deliberately filed, stored, or otherwise systematically maintained for future use, including being stored in electronic files, folders, or logs. The phrase "appropriate for preservation" means documentary materials made or received that, in the judgment of OSTP, should be filed, stored, or otherwise systematically maintained by the agency because of the evidence of agency activities or information they contain, even though the materials may not be covered by our current filing or maintenance procedures.

When determining whether e-mail messages are Federal records, keep in mind that multiple copies of messages or messages incorporated into other electronic messages may all be records if they are used for different purposes in the conduct of official business or filed in different files. More than one office may take action or otherwise use copies of a message. The copy would be record in *each* of those offices, and would be subject to NARA-approved disposition schedules.

Users should also be aware that preliminary drafts of final documents, rough notes, and similar materials must be maintained for purposes of adequate and proper documentation if:

- they contain unique information, such as annotations or comments, that helps explain the formulation and execution of basic policies, decisions, actions, or responsibilities; *and*
- they were circulated or made available to employees other than the creator for the purpose of approval, comment, action, or to keep staff informed about agency business.

Electronic messages and any attachments transmitted via electronic mail that satisfy the definition include:

- messages and any attachments containing information developed in preparing position papers, reports, and studies;
- messages and any attachments reflecting official actions taken in the course of conducting agency business;
- messages and any attachments conveying information on OSTP programs, policies, decisions, and essential transactions;
- messages and any attachments concerning statements of policy or the rationale for official decisions or actions;
- messages and any attachments documenting oral exchanges, such as meetings or telephone conversations, during which policy was discussed or formulated or other activities of OSTP were planned, discussed, or transacted;
- Messages and any attachments documenting the use of leave, agency procurement activities, personnel actions, or official agency financial actions.

This guidance about determining the record status of preliminary drafts transmitted via e-mail also applies to word processing documents shared on a network. Because drafts of such shared documents may be records, their record status must be reevaluated as changes are made. Substantive updates to such drafts that constitute records must be preserved by printing and filing with the final paper copy while minor changes do not need to be preserved. Such substantive updates should identify the author, recipient(s), and date of the draft, as well as similar data documenting substantive updates.

### Nonrecord or Personal Materials

Certain types of documentary materials created within OSTP are considered "nonrecord" because they do not meet the conditions of record status as explained above or because they are excluded from the status of records by statute. Typically, these include:

- reminders about meetings and appointments that contain no information of value about such events;
- telephone messages (unless the message contains information of value);
- invitations to unofficial social functions;
- preliminary drafts of correspondence, memoranda, reports, and studies that are not circulated to any other individual;
- preliminary drafts, work sheets, informal notes, and similar materials that contain the same information reflected in final documents and that do not document policy development or execution;
- notes about exclusively personal matters, such as private political or professional activities.

### Monitoring Record Status Designations

To assist the OSTP staff in making proper record status determinations, the Records Management staff will periodically examine a sample of all electronic mail messages and electronic calendars and task lists, including those designated as nonrecord materials. The purpose of the examination is to identify any problems in interpreting the official

guidance for distinguishing between record and nonrecord materials. The first of these sample inspections will take place within the next month. The Records Management staff will report their findings to me and recommend any needed changes in current guidance or procedures.

*Preserving Electronic Mail Messages*

All OSTP e-mail messages that are records will be preserved. To facilitate distinguishing between record and nonrecord messages, you are asked to identify all nonrecord messages by including the word "nonrecord" in the message subject field. You should determine whether a message is record material by following the guidelines in this memorandum. Messages not marked as "nonrecord" will be preserved as records. [Note that for the time being, all Internet messages are stored as records.] All record messages will be managed (e.g., preserved; searched for FOIA purposes) by OSTP's Records Management staff.

Transmission and Receipt Data

All electronic mail messages contain certain "transmission data" regarding the sender, addressee(s), and transmission (date and exact time) of a document. All e-mail messages that are records will be filed electronically complete with all transmission data. Individuals who transmit e-mail via user group names must forward hardcopy lists of the membership of each user group to the Records Management staff when a user group is created or updated.

If you request a read receipt for an electronic mail record, the read receipt is also a record and will be preserved with the message. You should request read receipts whenever it is necessary to confirm that an addressee has read a message by a certain time, such as when you assign tasks with a deadline or need concurrence by a definite time.

*Preserving Calendars*

Calendars and task lists created in ON-TIME are either personal materials or Federal records. Calendars and task lists that contain only personal business and are not shared are personal records and thus are not Federal records. Personal calendars and task lists do not need to be preserved or disposed of as records and may be updated, changed, or deleted at the discretion of the individual user. Calendars and task lists that contain information about government business are Federal records when they are circulated to or shared with others or placed in files that allow others in the EOP to access and view the calendars or task lists in connection with official business.

Calendars and task lists of employees other than high-level officials (see definition and OSTP position listing attached) that contain substantive information relating to official activities, the substance of which has not been incorporated into official files, will be retained for two years in accordance with GRS 23, item 5a. Entries in the calendars and associated data regarding authorized access, may *not* be deleted or destroyed during those two years unless the calendar and authorized access data has been printed and forwarded to the agency records officials.

Calendars and task lists of employees other than high-level officials that document routine activities and contain no substantive information relating to official activities may be deleted when no longer needed in accordance with GRS 23, item 5b; those with substantive information, the substance of which has been incorporated into organized files, may also be deleted when no longer needed.

Calendars and task lists relating to the schedules of high level officials at OSTP must be printed monthly and forwarded to OSTP's records management officials for preservation. When printing calendars for preservation, also print and file a list of the individuals who had authorization to enter changes to the calendar; it will be assumed that all OSTP staff had "read" access to a shared calendar.

\* \* \*

This memorandum supersedes all guidance on electronic mail issued prior to January 6, 1993, as well as the instructions on Electronic Federal Records on page 6 of the May 8, 1993, memo on "Federal Records." I cannot emphasize too strongly the importance of staff compliance with this guidance in order

to ensure that OSTP fulfills its legal obligations regarding the creation and preservation of Federal records. If you have any questions about this guidance, please contact me or Tanya Felder, the OSTP Records Management staff.

EXECUTIVE OFFICE
OF THE PRESIDENT
OFFICE OF SCIENCE
AND TECHNOLOGY POLICY

WASHINGTON, D.C. 20500

July 14, 1994

MEMORANDUM FOR BARBARA FERGUSON
FROM: JOHN H. GIBBONS
SUBJECT: MONITORING CC:MAIL AND ONTIME

In order to identify and correct any problems in OSTP staff's identification of e-mail records, you should institute the following plan for monitoring a sample of e-mail:

1. The Management Information Specialist (MIS) should program CC:Mail to forward each message a user creates to a mailbox designated "ALL."

2. The Records Management staff should examine a sample from the "ALL" box monthly following the issuance of written guidance to all staff. Improper designations of sampled materials will be corrected and deposited in the correct electronic file. Whenever you detect a pattern of mistakes in interpreting the guidance, consultations with individual staff should be undertaken and modifications of the general guidance should be considered. Materials designated nonrecord that fit into the pattern of mistakes, but were not included in the monitoring sample, should be reviewed to correct improper designations before such materials are deleted.

3. The sampling should consist of a statistically valid random sample of record and nonrecord messages and documents. The sample should be designed to ensure a high probability of selecting record and nonrecord messages and documents of each user.

4. The monitoring should include an annual report documenting the type of sampling conducted, number of materials reviewed, the number of materials incorrectly designated nonrecord and redesignated record, explanations of the incorrect designations, and interim modification(s) of the guidance. The report should include recommendations for modifications in guidance to staff or training. The report also should evaluate the adequacy of current schedule descriptions and retention periods for messages or other data on the e-mail systems, and recommend needed changes. The first of these reports should be submitted within 3 months after the issuance of written guidance to all staff.

5. When the Records Management staff reviews materials that departing staff seek to remove from OSTP, the Records Management staff should ensure that any records incorrectly designated nonrecord are redesignated and deposited in the correct electronic file.

EXECUTIVE OFFICE
OF THE PRESIDENT
OFFICE OF MANAGEMENT
AND BUDGET

WASHINGTON, D.C. 20503

July 14, 1994

MEMORANDUM FOR OMB EMPLOYEES
FROM: Robert G. Damus, General Counsel
SUBJECT: *New Recordkeeping Guidance for the OASIS All-in-One System*

In accordance with the court rulings in the *Armstrong v. EXOP* litigation, the Office of Administration (OA) has issued a new recordkeeping directive for EXOP agencies using the OASIS All-in-One system. The OA directive is enclosed. The directive provides guidance on the records responsibilities of individual OASIS users with respect to their electronic mail (e-mail) communications. The OA directive also addresses the records responsibilities of EXOP agencies themselves with respect to the appropriate handling of OASIS calendars and of the training and

monitoring of employees using the OASIS system.

OMB employees, in their use of the e-mail system, are required to apply the record-keeping guidance set forth in the OA directive.

This guidance shall be used in place of the e-mail guidance contained in the OMB Manual at Section 540–5.b, which is rescinded.

If you have any questions concerning this memorandum or the OA directive, please contact Steve Aitken of this office (x54728).

OFFICE OF NATIONAL DRUG
CONTROL POLICY
EXECUTIVE OFFICE OF THE
PRESIDENT

Washington, D.C. 20500

July 14, 1994

MEMORANDUM FOR ONDCP STAFF
FROM: ED JURITH
RE: NEW RECORDKEEPING GUID-
ANCE FOR THE *OASIS ALL–IN–ONE
SYSTEM*

In accordance with the court rulings in the *Armstrong v. EXOP* litigation, the Office of Administration (OA) has issued a new recordkeeping directive for EXOP agencies using the OASIS All–IN–ONE system. The OA directive is attached. The directive provides guidance on the records responsibilities of individual OASIS users with respect to their electronic mail (E–Mail) communications. The OA directive also addresses the records responsibilities of EOP agencies themselves with respect to the appropriate handling of OASIS calendars and of the training and monitoring of employees using the OASIS system.

ONDCP employees, in their use of the e-mail system, are required to apply the record-keeping guidance set forth in the OA directive.

The Information Management Division of OA will provide guidance and training to OASIS users on records management procedures. If you have any questions, please contact me

or OA Record Management Officer Nell Doering at OASIS address DOERING–N, or call her on extension 56471.

EXECUTIVE OFFICE OF THE
PRESIDENT COUNCIL
ON ENVIRONMENTAL QUALITY

WASHINGTON, D.C. 20503
MEMORANDUM

To: All CEQ Staff
From: Elisabeth Blaug
Attorney
Subj: New Record–Keeping Directive Issued
By Office of Administration (OA)
Date: July 14, 1994

Pursuant to the court rulings in Armstrong v. Executive Office of the President, OA has issued a new recordkeeping directive for Executive Office of the President (EOP) personnel using the OASIS All-in-One system. The directive, which is attached, provides guidance on the recordkeeping responsibilities of OASIS users regarding their use of electronic mail (E-mail) communications. The OA directive also addresses the recordkeeping responsibilities of EOP agencies institutionally regarding the appropriate handling of OASIS calendars, and the training and monitoring of employees using the OASIS system.

CEQ employees are required, in their use of the E-mail system, to apply the record-keeping guidance set forth in the OA directive. This guidance supersedes previous E-mail guidance.

Please review the new directive, and contact me if you have any questions.

DEFENDANTS' DESIGNATIONS OF
"HIGH–LEVEL OFFICIALS"

The following individual positions shall be designated by respective EOP components to constitute "high-level officials" within the scope of GRS 23, # 5, for the purpose of records management of electronic calendars on respective EOP electronic communications systems:

*Office of Administration*

Director

Assistant Director

Deputy Director for General Services

Deputy Director for Information Management

Deputy Director for Resources Management

Director, Administrative Operations Division

*Office of Management and Budget*

Director

Deputy Director (DD)

Deputy Director for Management (DDM)

Executive Associate Director

Special Assistants to the Director/DD/DDM

General Counsel

Associate Directors

Deputy Associate Directors

Assistant Directors

Deputy Assistant Directors

Controller

Deputy Controller

Administrator (OIRA, OFPP)

Deputy Administrators

*Office of National Drug Control Policy*

Director

Chief of Staff

Director of Public and Legislative Affairs

Director of the Office of Planning and Budget

Director, Counter–Drug Technology Assessment Center

General Counsel

Deputy Director for Demand Reduction

Deputy Director for Supply Reduction

Associate Director for State and Local Affairs

**Note:** (a) the prior positions of "Director of Public Affairs" and "Director of Congressional Relations" have been merged into one position named "Director of Public and Legislative Affairs"; (b) the "Director of Planning, Budget and Administration" is now ti-

tled "Director of the Office of Planning and Budget".

*Office of Science and Technology Policy*

Director

Executive Assistant

General Counsel

Assistant to the Director for Intergovernmental Affairs [formerly "External Affairs"]

Associate Directors

*Office of the United States Trade Representative*

United States Trade Representative

Chief of Staff

Deputy U.S. Trade Representatives

General Counsel

Deputy General Counsel

Counselor

Special Counsels

Assistant U.S. Trade Representatives & Deputy General Counsel

Chief Textile Negotiator

*Council for Environmental Quality*

Chairman [including Acting Chairman]

Confidential Assistant

General Counsel

### EXHIBIT D

Federal Register/Vol. 59, No. 57/Thursday, March 24, 1994/Proposed Rules

**NATIONAL ARCHIVES AND RECORDS ADMINISTRATION**

**36 CFR Part 1234**

**RIN 3095–AA58**

**Electronic Mail Systems**

**AGENCY:** National Archives and Records Administration.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The National Archives and Records Administration (NARA) is developing standards for management of Federal records created or received on electronic

mail (E-mail) systems. These standards will be published as an appendix to regulations on electronic records in 36 CFR part 1234 and will supplement the NARA instructional guide, Managing Electronic Records. The standards would affect all Federal agencies.

**DATES:** Comments must be submitted by June 22, 1994.

**ADDRESSES:** Submit comments to Director, Records Appraisal and Disposition Division, National Archives at College Park, 8601 Adelphi Road, College Park, MD 20740–6001. Comments may be faxed to (301) 713–6852 or (301) 713–6850. Comments also may be sent to the following Internet address: ooa@cu.nih.gov

**FOR FURTHER INFORMATION CONTACT:** James J. Hastings, Director, Records Appraisal and Disposition Division, (301) 713–7096.

**SUPPLEMENTARY INFORMATION:**

**Background**

NARA has been working with components of the Executive Office of the President to develop specific records management policies and procedures for their E-mail records, pursuant to court rulings in *Armstrong v. Executive Office of the President,* 1 F.3d 1274 (D.C.Cir.1993). Because nearly all Federal agencies now use E-mail, NARA recognizes that there also is the need for Government-wide standards on managing E-mail records. Consequently, NARA has drafted the following standards for all Federal government agencies on the proper means of identifying, maintaining, and disposing of Federal records created or received on an E-mail system. These standards reflect the legal definition of records in the Federal Records Act (44 U.S.C. 3301) and supplement NARA records management guidance previously issued under the law (44 U.S.C. 2904 and 2905; 36 CFR Chapter XII Subchapter B).

When finalized, these general standards will be used by Federal agencies to develop specific recordkeeping policies, procedures, and requirements to fulfill their obligations under the statute and regulations. Agencies that already have specific E-mail recordkeeping policies, procedures, and requirements in place should review them to ensure that they are consistent with these general NARA standards. In addition, agencies are encouraged to submit their directives implementing these standards to NARA for review and comment.

NARA has already issued regulations on electronic recordkeeping (36 CFR part 1234), and an instructional guide, Managing Electronic Records. In addition, General Records Schedules 20, Electronic Records, and 23, "Records Common to Most Offices," provide disposition authority for some types of records created or received in electronic form. These proposed new E-mail standards will expand this general guidance on managing electronic records.

In developing these standards NARA has recognized that agency E-mail systems have different characteristics and agencies have differing recordkeeping requirements. Some agencies may find that currently it is only feasible to maintain E-mail records on paper. Other agencies may find that currently it is possible and desirable to maintain E-mail records electronically. While NARA recognizes the practical considerations that may preclude electronic maintenance of E-mail records at this time, agencies are encouraged to consider the benefits for future use of electronically maintaining those records that are likely to be permanently valuable. These benefits include the ease of searching and manipulating electronic records, the availability of electronic records to many users simultaneously, and efficient storage. Agencies that are not now technologically able to maintain E-mail records electronically should consider electronic maintenance when updating or designing systems. This is particularly important for E-mail records that are likely to be appraised as permanent by NARA, such as records of cabinet members or other high level officials. The recent decision of the Office of Administration of the Executive Office of the President to begin maintaining its E-mail records in an electronic recordkeeping system is an example of an agency updating a system that contains permanently valuable records. NARA encourages other

agencies to consider the value of electronic maintenance of E-mail records, and it will assist agencies in evaluating the desirability of an electronic format.

Agencies must also determine how to manage under the Federal Records Act the transmission and receipt information in the E-mail system. The agency should decide how to maintain the transmission and receipt information either as part of the E-mail communication or as a separate record linked to the communication. Because printouts may not contain necessary transmission and receipt information, the Court of Appeals in *Armstrong* held that to comply with the Federal Records Act, certain transmission and receipt information must be preserved along with all E-mail messages that are Federal records.

NARA will work closely with the agencies in the implementation of the final standards and will review, upon request, agency directives concerning E-mail records. In addition, NARA records management evaluations of agencies will include review and analysis of the management of E-mail records.

**Comments**

In soliciting comments from Federal agencies and the public, NARA particularly requests that agencies address the practical effects of compliance with these standards. Specifically, NARA is interested in how agencies manage documents with transmission and receipt information and handle the other types of documents, such as calendars, that are frequently part of electronic communications systems. In addition, NARA would like to learn from agencies if they intend to maintain E-mail records electronically now or in the future, and how they would monitor the E-mail system for compliance with recordkeeping obligations. Agencies are also encouraged to comment on any other aspect of this guidance, or to request further information or clarification. NARA encourages those submitting comments to include examples of solutions to electronic recordkeeping problems that may be of assistance to other agencies in developing recordkeeping requirements and programs for these systems.

**List of Subjects in 36 CFR Part 1234**

**Archives and records;** Computer technology.

For the reasons set forth in the preamble, NARA proposes to amend part 1234 of chapter XII of the Code of Federal Regulations as follows:

**PART 1234—ELECTRONIC RECORDS MANAGEMENT**

1. The authority citation for part 1234 continues to read as follows:

**Authority:** 44 U.S.C. 2904, 3101, 3102, and 3105.

2. Appendix A is added to part 1234 as follows:

**Appendix A to Part 1234—Managing Federal Records on Electronic Mail Systems**

*1. Introduction*

These standards cover documentary materials created or received by electronic mail (E-mail) systems in Federal agencies. Because of the widespread use of E-mail for conducting agency business, many E-mail documents meet the definition of a "record" under the Federal Records Act (44 U.S.C. chapters 29, 31, and 33).

The definition of "record" in the Federal Records Act encompasses documentary materials in all media. The Act requires the National Archives and Records Administration (NARA) to issue records management standards for all Federal agencies (44 U.S.C. 2094 and 2905). NARA has issued records management regulations on electronic records (36 CFR part 1234), guidance on electronic recordkeeping entitled *Managing Electronic Records* (1992), and *General Records Schedules* 20, Electronic Records, and 23, Records Common to Most Offices. The standards being proposed here expand the existing issuances and apply established records management and archival principles and techniques to records created or received on E-mail systems. They provide instructions to program officials, information specialists, records managers, and other E-mail users on the proper means of identifying, maintaining, and disposing of E-mail records.

## 2. *Definitions*

The following definitions of terms used in these standards are included for clarity and convenience. We have provided citations to those that are based on definitions in the Federal Records Act or existing NARA guidance or regulations.

★ *Electronic Mail System.* A computer application used to create, receive, and transmit messages and other documents or create calendars that can be used by multiple staff members. Excluded from this definition are file transfer utilities (software that transmits files between users but does not retain any transmission data), data systems used to collect and process data that have been organized into data files or data bases on either personal computers or main frame computers, and word processing documents not transmitted on an E-mail system.

★ *Electronic Record.* Numeric, graphic, text, and any other information recorded on any medium that can be read by using a computer *and* satisfies the definition of a Federal record in 44 U.S.C. 3301. This includes, but is not limited to, both on-line storage and off-line media such as tapes, disks, and optical disks. (36 CFR 1234.1)

★ *Electronic Mail Message.* A document created or received on an E-mail system including brief notes, more formal or substantive narrative documents, and any attachments, such as word processing documents, which may be transmitted with the message.

★ *General Records Schedules.* Schedules authorizing the disposal, after the lapse of specified periods of time, of records common to several or all agencies if such records will not, at the end of the periods specified, have sufficient administrative, legal, research, or other value to warrant their further preservation by the United States Government. (44 U.S.C. 3303a(d))

★ *Nonrecord Material.* Materials that do not meet the statutory definition of records (44 U.S.C. 3301), i.e., they were not created or received under Federal law or in connection with Government business, or they are not preserved or considered appropriate for preservation because they lack evidence of agency activities or information of value. In addition, the statute specifically excludes from coverage extra copies of documents kept only for convenience of reference, stocks of publications and processed documents, and library or museum materials intended solely for reference or exhibit. (36 CFR 1220.14, 1222.34(d)). Nonrecord materials also include personal papers and materials.

★ *Permanent Record.* Any Federal record that NARA has determined to have sufficient value to warrant its continued preservation by the National Archives and Records Administration. (36 CFR 1220.14)

★ *Preserved Record.* Documentary materials that have been deliberately filed, stored, or otherwise systematically maintained as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of the data in them. This applies to documentary materials in a file or other storage system, including electronic files and systems, and those temporarily removed from the files or other storage system.

★ *Records.* All books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them. (44 U.S.C. 3301)

★ *Recordkeeping System.* A system for collecting, organizing, and storing records in order to facilitate their preservation, retrieval, use, and disposition and to fulfill recordkeeping requirements.

★ *Records Management.* The planning, controlling, directing, organizing, training, promoting, and other managerial activities involved with respect to records creation, records maintenance and use, and records

disposition in order to achieve adequate and proper documentation of the policies and transactions of the Federal Government and effective and economical management of agency operations. (36 CFR 1220.14)

★ *Records Schedule.* A document describing, providing instructions for, and approving the disposition of specified Federal records. It consists of one of the following:

(a) An SF 115, Request for Records Disposition Authority, which NARA has approved to authorize the disposition of Federal records;

(b) A *General Records Schedule* (GRS) issued by NARA; or

(c) A printed agency manual or directive containing the records descriptions and disposition instructions approved by NARA on one or more SF 115s or issued by NARA in the GRS.

(36 CFR 1220.14)

★ *Security Backup.* Copy of a record in any medium created to provide a means of ensuring retention and access in the event the original record is destroyed, inaccessible, or corrupted.

★ *System Backup.* Copy on off-line storage media of software and data stored on direct access storage devices in a computer system used to recreate a system and its data in case of unintentional loss of data or software.

★ *Temporary Record.* Any Federal record that the Archivist of the United States has determined to have insufficient value to warrant its preservation by the National Archives and Records Administration. (36 CFR 1220.14)

★ *Transmission and Receipt Data.*

(a) *Transmission Data.* Information in E-mail systems regarding the identities of sender and addressee(s), and the date and time messages were sent.

(b) *Receipt Data.* Information in E-mail systems regarding date and time of receipt of a message, and/or acknowledgment of receipt or access by addressee(s).

## 3. Records Management Responsibilities

Under the Federal Records Act, agencies' records management responsibilities include creating and maintaining adequate and proper Federal records, regardless of the medium in which the records are created or received, and scheduling the disposition of records no longer needed for conduct of Government business (44 U.S.C. Chapters 31 and 33). Agencies are legally obligated to ensure creation and maintenance, for an appropriate period, of "records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency * * *." (44 U.S.C. 3101). Because E-mail is often used to conduct Government business, it is critical that agencies take steps to ensure that records created or received on E-mail systems are managed according to the law. Accordingly, agencies must develop and implement an agency-wide program for the management of all Federal records created or received on electronic communications systems (36 CFR 1234.10(a)). All features of E-mail systems (including messages, calendars, directories, distribution lists, attachments such as word processing documents, messages sent or received over external communications systems) must be evaluated to identify documentary materials that satisfy the definition of Federal records. An agency's records management program should address all Federal records in the E-mail system. The agency should also incorporate procedures that ensure recordkeeping and disposition requirements are met before approving a new E-mail system or enhancements to an existing system (36 CFR 1234.10(d)).

## 4. What Are Federal Records?

The definition of "records" in the Federal Records Act specifies the criteria under which documentary materials are to be considered Federal records. The phrase "regardless of physical form or characteristics" means that the records may be paper, film, disk, or any other physical type or form; and that the method used to record information may be manual, mechanical, photographic,

electronic, or any combination of these or other technologies.

Whatever the medium, the statute establishes two conditions that must be met for a document to be a record: (1) The document is made or received by agency personnel under Federal law or in connection with the transaction of public business, and (2) it is preserved or appropriate for preservation. Documentary materials, in any physical form, are Federal records when they meet both tests. The word "preserved" means the deliberate act of filing, storing, or otherwise systematically maintaining material as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of the data in it. "Appropriate for preservation" means documentary materials made or received by an agency which in its judgment should be filed, stored, or otherwise systematically maintained by the agency because of the evidence of agency activities or information they contain, even though the materials may not be covered by its current filing or maintenance procedures (36 CFR 1222.12). Agencies must apply carefully reasoned judgment in deciding when E-mail documents are "appropriate for preservation" and in exercising this judgment, must consider their obligation to create and maintain records that adequately document their policies, programs, and activities under 44 U.S.C. 3101 (see previous section entitled Records Management Responsibilities).

### 5. Record Status of E–Mail Messages

It is critical that all E-mail users understand the concept of Federal records and that agencies provide sufficient information for users to distinguish Federal records from nonrecord materials. E-mail messages are Federal records when they meet the criteria specified in the statutory definition, i.e., they are made or received under Federal law or in the conduct of agency business, and they are preserved or are appropriate for preservation as evidence of the agency's organization, functions, policies, decisions, procedures, operations, or other activities, or contain infor-

mation of value. Since E-mail systems transmit a variety of messages, not all E-mail documents will meet the statutory definition of records.

Some categories of E-mail messages or documents that would satisfy the definition of record are those:

1. Containing information developed in preparing position papers, reports, and studies;

2. Reflecting official actions taken in the course of conducting agency business;

3. Conveying information on agency programs, policies, decisions, and essential transactions;

4. Conveying statements of policy or the rationale for official decisions or actions;

5. Documenting oral exchanges, such as meetings or telephone conversations, during which policy was discussed or formulated or other agency activities were planned, discussed, or transacted.

E-mail messages are not considered nonrecord materials merely because the information they contain may also be available elsewhere on paper or in electronic files. Separate E-mail messages that contain the same information on Government activities may differ in important respects and, thus, are not automatically nonrecord materials. In addition, multiple copies of messages may all be records if they are used for different purposes in the conduct of official business or filed in different files. In other words, if more than one office takes action or otherwise uses copies of a message, copies would be records in each of those offices.

To assist in the process of determining record status, NARA recommends that agencies consider designing into their current or future E-mail systems a feature that helps users to identify records. For example, agencies may want their systems to allow users to tag messages as record or nonrecord or to automatically default to the determination that system-produced documents are records, requiring users to take additional steps to mark a document as nonrecord. Another option would be to develop a system that analyzes the contents of a message ac-

cording to specified rules in order to prompt the user with a suggested categorization.

For further information on making these distinctions between records and nonrecord materials, see Personal Papers of Executive Branch Officials: A Management Guide, published by NARA in 1992.

### 6. Transmission and Receipt Data

Besides the text of messages, E-mail systems may provide transmission and receipt data. In some systems, transmission data is part of the message. In other systems some transmission data is in a separate message. Generally, receipt data is separate from the messages.

E-mail messages require some transmission data to be intelligible and to understand their context. It is essential that necessary transmission data is preserved with all E-mail records. Many E-mail systems automatically capture with an E-mail message the identity of the sender and the addressee(s) and the date the message was sent. Just as with a paper record, this transmission data is necessary for an E-mail record to be complete and understandable. Agencies should determine if any other E-mail transmission data is needed for purposes of adequacy of documentation. Both the message and the related transmission data are Federal records and must be maintained in recordkeeping systems for the same retention period. (See section entitled Maintenance of Federal Records Created by an E-mail System, below.)

E-mail systems may provide users with the ability to request acknowledgments or receipts showing that an E-mail message reached the mailbox or inbox of each addressee. E-mail systems may also provide, upon request, information about or acknowledgments of E-mail messages that were received or viewed by the addressee. Agency instructions to E-mail system users should specify when to request such receipts or acknowledgments. Users should request receipt data when it is needed for adequate and proper documentation of agency activities, especially when it is necessary to confirm

when an addressee has received or viewed a message. Agencies should maintain such receipts and acknowledgments associated with Federal records for the same period as the electronic message to which they refer.

### 7. Draft Documents

Agency staff may use the E-mail system to circulate draft documents created on either the E-mail system or a separate word processing or other system. Preliminary drafts must be maintained for purposes of adequate and proper documentation if (1) they contain unique information, such as annotations or comments, that helps explain the formulation or execution of agency policies, decisions, actions, or responsibilities, and (2) they were circulated or made available to employees other than the creator for the purpose of approval, comment, action, recommendation, follow-up, or to keep staff informed about agency business.

Because drafts in electronic form may be Federal records, the record status of electronically created drafts that are transmitted as part of, or as attachments to, E-mail messages must be evaluated as changes are made. Successive drafts containing substantive revisions may be Federal records; drafts containing only minor changes are less likely to qualify as records. If the draft qualifies as a record, the agency should save a copy before the draft is deleted or altered.

### 8. Directories and Distribution Lists

Some electronic communication systems identify users by codes or nicknames. Some identify the recipients of a communication only by the name of a distribution list. Directories or distribution lists linking such shorthand names or codes with the names of users must be retained to ensure identification of the sender and addressee(s) of messages that are records.

### 9. Calendars

An E-mail system may provide calendars and task lists for users. Agencies that have such features on their E-mail system should advise users that calendars, indexes of events, and task lists are Federal records if they meet the criteria specified by law. Cal-

endars, whether individual or shared, despite the level of the individual to whom they relate, may be Federal records or they may be personal materials. The NARA publication Personal Papers of Executive Branch Officials: a Management Guide provides guidance on the record status of calendars. That publication notes that the Freedom of Information Act case law regarding "agency records" is the most pertinent guidance for deciding whether calendars are Federal records.

Most calendars and related documents that are Federal records are disposable under General Records Schedule 23, Item 5. Federal record calendars that relate to the activities of high-level officials, however, must be specifically scheduled for disposition to allow NARA to appraise their value for future use. GRS 23 provides guidance on identifying high-level officials. Users may delete calendars that are nonrecord materials at their discretion.

### 10. External Communications Systems

Some Government agencies use electronic communications systems external to the Government, such as the Internet or other commercial network services. These communications systems have established protocols that are not subject to agency modification. However, the use of external communications systems which are neither owned nor controlled by the agency does not alter in any way the agency's obligation under the Federal Records Act. Agencies must ensure that Federal records sent or received on these systems are preserved and that reasonable steps are taken to capture available transmission and receipt data needed by the agency. As is the case with any Federal record, those that are communicated to or received from persons outside the agency or Government should include the identity of the outside senders or addressees.

### 11. Maintenance of Federal Records Created by an E–Mail System

Agencies must ensure that all E-mail records are maintained in appropriate recordkeeping systems. Such recordkeeping systems must meet the following requirements: (1) Permit easy and timely retrieval; (2) facilitate the distinction between record and nonrecord materials (if such distinctions were not made previously); (3) retain the records in a usable format until their authorized disposition date; and (4) permit transfer of permanent records to the National Archives and Records Administration (see 36 CFR 1228.188, 36 CFR 1234.28(a)).

Agencies should consider the advantages of maintaining their records electronically. An electronic system may be more easily searched and manipulated than records in paper files. An electronic file may also be available for simultaneous use by multiple staff members and may provide a more efficient method to store records. In addition, future use of permanently valuable E-mail records for agencies and for historical research could be enhanced by storing them electronically.

System backup tapes normally are not suitable for recordkeeping purposes because they are merely mirrors of storage disks with data and documents scattered throughout as they are on the disks themselves. They are meant to provide only a means of recreating a system and its data in case of emergency. Agencies should have a separate system that is appropriate for recordkeeping. In all cases when records are maintained electronically, agencies should provide for regular backups to guard against system failures or loss through inadvertent erasures (36 CFR 1234.30).

### A. Maintenance on the E–Mail System

E-mail systems are generally designed for convenient and efficient agency communications and not as a system for storing agency records for their entire life cycle. To maintain instantaneous communications capability without increasing hardware capacity, these systems often limit the number of messages that can accumulate on the system and may automatically delete messages after a short period. If an E-mail system is not designed for or adaptable to use as a recordkeeping system, E-mail records must be copied or moved to an appropriate recordkeeping system for maintenance and disposition.

B. Maintenance in an Electronic Record-keeping System Other Than the E–Mail System

Some agencies store their E-mail records on an electronic system separate from the E-mail system. Agencies that maintain their records in this way must move or copy all E-mail records to the electronic recordkeeping system. The recordkeeping system must allow segregation of permanent and temporary records and have sufficient capacity to store records for their authorized retention periods (36 CFR 1234.10).

Agencies may retain records from E-mail systems in an off-line electronic storage format (such as optical disk or magnetic tape) that meets the requirements described above (36 CFR 1234.28(a)). Factors to be considered in selecting a storage medium or converting from one medium to another are identified in 36 CFR 1234.28(b)). Agencies may use optical disk systems for the storage and retrieval of permanent records while the records remain in the agency's legal custody, but NARA currently does not accession permanent records stored on optical disks. Permanent records stored on optical disk must be converted to a medium acceptable to NARA at the time of transfer to NARA's legal custody, as specified in 36 CFR 1228.188.

C. Maintenance in Paper Recordkeeping Systems

Agencies that do not have the technological capability to maintain E-mail records in an electronic recordkeeping system must print their E-mail records. In such instances, agencies must also print related transmission and receipt data and maintain it together with the printed communications according to the same procedures as other paper records.

Other agencies may have the technological capability to maintain E-mail records electronically but, nevertheless, determine that current agency use is best served by also printing them on to paper. While it is the agency's responsibility to determine whether its current needs are best served by one or both formats, an electronic format may be in the best interest of future use. Accordingly, agencies must schedule and NARA must appraise both formats before E-mail records are deleted from the electronic recordkeeping system. This ensures the opportunity for NARA to determine the best format for the preservation of records of potential historical or other research value. (See the section below for instructions on the disposition of records.)

Any agencies that maintain E-mail records only on paper even though they have the technology to maintain them electronically are strongly encouraged to consider the benefits of an electronic format. NARA will assist such agencies in evaluating the advantages of maintaining E-mail records electronically.

Those agencies that have no plans for implementing an electronic recordkeeping system are also encouraged to consider this format when their current systems are redesigned or replaced.

12. *Disposition of E–Mail Records*

E-mail records may not be deleted or otherwise disposed of without prior disposition authority from NARA (44 U.S.C. 3303a). This applies to all versions of E-mail records, including the original record that is on the E-mail system and all copies that have been forwarded to a recordkeeping system. NARA authorizes records disposition through two mechanisms; issuance of the General Records Schedules developed by NARA for temporary records common to most or all Federal agencies, and approval of schedules developed by agencies for records unique to the agency. The authorization process employed by NARA involves appraisal, which is the determination of the historical or other value of the records including the most appropriate format for future use when the same information is captured in records on different physical formats.

Electronic records must be scheduled even if the same information is available in another medium, including paper printouts of electronically stored records. Information in electronic records may have greater research utility than similar information stored on another medium because it is easier to access

and manipulate. Also, it may be more efficient to capture transmission and receipt data in electronic systems. Thus, the disposition of electronic records may differ from the disposition of paper records with the same information. The disposition of all records, regardless of medium (paper, magnetic, microform, etc.) must be in accordance with an approved schedule.

A. Records on the E–Mail System

If an agency has an E-mail system that is designed for or is adaptable for use as an agency recordkeeping system as well as a communications system, users must be instructed on the required steps to be taken to ensure that the record on the user's screen or in his or her mailbox is forwarded to the recordkeeping feature of the system. If, on the other hand, an agency has an E-mail system that cannot also serve as a recordkeeping system, users should be instructed to forward all records from the E-mail system to an appropriate recordkeeping system to ensure that the records are preserved and the E-mail system continues to operate efficiently. When the necessary steps have been taken to preserve the record by using the recordkeeping feature or by forwarding it to an appropriate recordkeeping system, the identical version that remains on the user's screen or in the user's mailbox has no continuing value to the agency or for future research. Therefore, NARA considers the version of the record on the "live" E-mail system appropriate for deletion after it has been preserved on a recordkeeping system along with all appropriate transmission data. NARA will revise General Records Schedule 23 to authorize deletion of the copy of the record on the "live" E-mail system after the necessary preservation steps have been taken. This general authorization will apply only to the E-mail record on the "live" E-mail system. There is no formal authorization at this time for agencies to delete E-mail records from the E-mail system if they are stored only on the system itself or if they have been transferred to an electronic recordkeeping system. The revised General

Records Schedule will extend the authorization to these categories of records.

B. Records in Recordkeeping Systems

Because E-mail records must be maintained for varying retention periods and, when appraised as permanent, transferred to NARA, it is not appropriate for NARA to issue a General Records Schedule that pertains to all E-mail records in recordkeeping systems. Consequently, those E-mail records that have been incorporated into a recordkeeping system that includes records from other sources or systems must be managed in accordance with the records schedule of the recordkeeping system in which they are filed. Alternatively, those E-mail records that are maintained as a separate system must be separately scheduled. Agencies must develop and submit to NARA schedules that identify the categories of E-mail records in their systems if they are maintained separately so that NARA can appraise the records and provide appropriate disposition authority.

As indicated previously, it is established NARA policy that agencies that maintain records in paper and electronic formats must receive the approval of NARA before disposing of either format. This will ensure that future use considerations enter into determinations of the most appropriate format for the preservation of permanent records.

13. Security of E–Mail Records

Agencies must take adequate measures to protect records in E-mail systems (36 CFR 1234.26). Security measures must protect E-mail records from unauthorized alterations or deletions. Agencies should regularly back up messages stored on-line to off-line media to guard against system failures or inadvertent erasures.

14. Training Employees

Agencies must ensure that all employees are familiar with the legal requirements for creation, maintenance, and disposition of records on E-mail systems. The agency's directives must provide sufficient guidance so that agency personnel are familiar with the agency's specific recordkeeping requirements

and can distinguish between records and nonrecord materials on E-mail systems (36 CFR 1222.30). Because Federal records may be created using an E-mail system, each agency using an E-mail system should provide records management training and guidance for all employees which includes criteria for determining which E-mail messages are records. As indicated above, it may be useful for agencies to have designed into their E-mail systems a feature that helps users to identify Federal records.

15. *Monitoring Implementation of Recordkeeping Guidance for the E–Mail System*

Agencies are responsible for monitoring the implementation of records management guidance to ensure that E-mail users are accurately identifying records and properly maintaining them. Each agency must ensure that the implementation of directives concerning records on its E-mail system is carried out by reviewing the systems periodically for conformance to established agency procedures. These reviews should consist of auditing or reviewing representative samples of all electronic communications, conducting periodic staff interviews, and internal records management evaluations. The purpose of these reviews is to ensure that E-mail users properly determine record status and that record messages are being properly maintained. These reviews would determine whether permanent and temporary records are segregable and schedules are being implemented properly. Such reviews should be used to correct errors when they are found, and to evaluate, clarify, and update agency recordkeeping directives, disposition schedules, and training for agency staff (36 CFR 1234.10(*l*)). Reports concerning the results of the reviews should be made available to NARA upon request and when it conducts evaluations of the agency's records management program.

16. *Conclusion*

E-mail systems provide unprecedented communications convenience. However, agencies must take the necessary measures to ensure that there is no diminution of their records resulting from the use of E-mail systems. E-mail systems have become im-portant tools for the transmission of substantive information, and, therefore, they are used to create Federal records. Agencies must take special care that employees understand their responsibilities when using E-mail to ensure the adequate creation and proper maintenance and disposition of Federal records.

As specified in 44 U.S.C. 3102, NARA and the agencies shall cooperate in the implementation of NARA standards. Agencies should amend their recordkeeping policies and procedures where necessary to meet these standards. NARA will assist agencies in implementing these standards by reviewing agency directives concerning E-mail and by participating in agency considerations of maintaining permanent E-mail records electronically. NARA and the agencies will work together to ensure that recordkeeping policies and programs for E-mail records serve the needs of the agencies and the needs of future researchers.

Dated: March 18, 1994.

**Trudy Huskamp Peterson,**

*Acting Archivist of the United States.*

[FR Doc. 94–6939 Filed 3–23–94; 8:45 am]

**BILLING CODE 7515–01–P**